# SIERRA CLUB v. MORTON, SECRETARY OF THE INTERIOR, ET AL.

No. 70–34.  Argued November 17, 1971—Decided April 19, 1972

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE and MARSHALL, JJ., joined.  DOUGLAS, J., *post*, p. 741, BRENNAN, J., *post*, p. 755, and BLACKMUN, J., *post*, p. 755, filed dissenting opinions.  POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Leland R. Selna, Jr.,* argued the cause for petitioner. With him on the briefs was *Matthew P. Mitchell.*

*Solicitor General Griswold* argued the cause for respondents. With him on the brief were *Assistant Attorney General Kashiwa, Deputy Assistant Attorney General Kiechel, William Terry Bray, Edmund B. Clark,* and *Jacques B. Gelin.*

Briefs of *amici curiae* urging reversal were filed by *Anthony A. Lapham* and *Edward Lee Rogers* for the Environmental Defense Fund; by *George J. Alexander* and *Marcel B. Poché* for the National Environmental Law Society; and by *Bruce J. Terris* and *James W. Moorman* for the Wilderness Society et al.

Briefs of *amici curiae* urging affirmance were filed by *E. Lewis Reid* and *Calvin E. Baldwin* for the County of Tulare; by *Robert C. Keck* for the American National Cattlemen's Assn. et al.; and by *Donald R. Allen* for the Far West Ski Assn. et al.

MR. JUSTICE STEWART delivered the opinion of the Court.

I

The Mineral King Valley is an area of great natural beauty nestled in the Sierra Nevada Mountains in Tulare County, California, adjacent to Sequoia National Park. It has been part of the Sequoia National Forest since 1926, and is designated as a national game refuge by special Act of Congress.[1] Though once the site of extensive mining activity, Mineral King is now used almost exclusively for recreational purposes. Its relative inaccessibility and lack of development have limited the number of visitors each year, and at the same time have preserved the valley's quality as a quasi-wilderness area largely uncluttered by the products of civilization.

---

[1] Act of July 3, 1926, § 6, 44 Stat. 821, 16 U. S. C. § 688.

The United States Forest Service, which is entrusted with the maintenance and administration of national forests, began in the late 1940's to give consideration to Mineral King as a potential site for recreational development. Prodded by a rapidly increasing demand for skiing facilities, the Forest Service published a prospectus in 1965, inviting bids from private developers for the construction and operation of a ski resort that would also serve as a summer recreation area. The proposal of Walt Disney Enterprises, Inc., was chosen from those of six bidders, and Disney received a three-year permit to conduct surveys and explorations in the valley in connection with its preparation of a complete master plan for the resort.

The final Disney plan, approved by the Forest Service in January 1969, outlines a $35 million complex of motels, restaurants, swimming pools, parking lots, and other structures designed to accommodate 14,000 visitors daily. This complex is to be constructed on 80 acres of the valley floor under a 30-year use permit from the Forest Service. Other facilities, including ski lifts, ski trails, a cog-assisted railway, and utility installations, are to be constructed on the mountain slopes and in other parts of the valley under a revocable special-use permit. To provide access to the resort, the State of California proposes to construct a highway 20 miles in length. A section of this road would traverse Sequoia National Park, as would a proposed high-voltage power line needed to provide electricity for the resort. Both the highway and the power line require the approval of the Department of the Interior, which is entrusted with the preservation and maintenance of the national parks.

Representatives of the Sierra Club, who favor maintaining Mineral King largely in its present state, followed the progress of recreational planning for the valley

with close attention and increasing dismay. They unsuccessfully sought a public hearing on the proposed development in 1965, and in subsequent correspondence with officials of the Forest Service and the Department of the Interior, they expressed the Club's objections to Disney's plan as a whole and to particular features included in it. In June 1969 the Club filed the present suit in the United States District Court for the Northern District of California, seeking a declaratory judgment that various aspects of the proposed development contravene federal laws and regulations governing the preservation of national parks, forests, and game refuges,[2] and also seeking preliminary and permanent injunctions restraining the federal officials involved from granting their approval or issuing permits in connection with the Mineral King project. The petitioner Sierra Club sued as a membership corporation with "a special interest in the conservation and the sound maintenance of the national parks, game refuges and forests of the country," and invoked the judicial-review provisions of the Administrative Procedure Act, 5 U. S. C. § 701 *et seq.*

---

[2] As analyzed by the District Court, the complaint alleged violations of law falling into four categories. First, it claimed that the special-use permit for construction of the resort exceeded the maximum-acreage limitation placed upon such permits by 16 U. S. C. § 497, and that issuance of a "revocable" use permit was beyond the authority of the Forest Service. Second, it challenged the proposed permit for the highway through Sequoia National Park on the grounds that the highway would not serve any of the purposes of the park, in alleged violation of 16 U. S. C. § 1, and that it would destroy timber and other natural resources protected by 16 U. S. C. §§ 41 and 43. Third, it claimed that the Forest Service and the Department of the Interior had violated their own regulations by failing to hold adequate public hearings on the proposed project. Finally, the complaint asserted that 16 U. S. C. § 45c requires specific congressional authorization of a permit for construction of a power transmission line within the limits of a national park.

After two days of hearings, the District Court granted the requested preliminary injunction. It rejected the respondents' challenge to the Sierra Club's standing to sue, and determined that the hearing had raised questions "concerning possible excess of statutory authority, sufficiently substantial and serious to justify a preliminary injunction . . . ." The respondents appealed, and the Court of Appeals for the Ninth Circuit reversed. 433 F. 2d 24. With respect to the petitioner's standing, the court noted that there was "no allegation in the complaint that members of the Sierra Club would be affected by the actions of [the respondents] other than the fact that the actions are personally displeasing or distasteful to them," *id.,* at 33, and concluded:

"We do not believe such club concern without a showing of more direct interest can constitute standing in the legal sense sufficient to challenge the exercise of responsibilities on behalf of all the citizens by two cabinet level officials of the government acting under Congressional and Constitutional authority." *Id.,* at 30.

Alternatively, the Court of Appeals held that the Sierra Club had not made an adequate showing of irreparable injury and likelihood of success on the merits to justify issuance of a preliminary injunction. The court thus vacated the injunction. The Sierra Club filed a petition for a writ of certiorari which we granted, 401 U. S. 907, to review the questions of federal law presented.

## II

The first question presented is whether the Sierra Club has alleged facts that entitle it to obtain judicial review of the challenged action. Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what

has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy," *Baker* v. *Carr*, 369 U. S. 186, 204, as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Flast* v. *Cohen*, 392 U. S. 83, 101. Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.[3]

The Sierra Club relies upon § 10 of the Administrative Procedure Act (APA), 5 U. S. C. § 702, which provides:

> "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency

---

[3] Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions, *Muskrat* v. *United States*, 219 U. S. 346, or to entertain "friendly" suits, *United States* v. *Johnson*, 319 U. S. 302, or to resolve "political questions," *Luther* v. *Borden*, 7 How. 1, because suits of this character are inconsistent with the judicial function under Art. III. But where a dispute is otherwise justiciable, the question whether the litigant is a "proper party to request an adjudication of a particular issue," *Flast* v. *Cohen*, 392 U. S. 83, 100, is one within the power of Congress to determine. Cf. *FCC* v. *Sanders Bros. Radio Station*, 309 U. S. 470, 477; *Flast* v. *Cohen, supra*, at 120 (Harlan, J., dissenting); *Associated Industries* v. *Ickes*, 134 F. 2d 694, 704. See generally Berger, Standing to Sue in Public Actions: Is it a Constitutional Requirement?, 78 Yale L. J. 816, 837 *et seq.* (1969); Jaffe, The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff, 116 U. Pa. L. Rev. 1033 (1968).

action within the meaning of a relevant statute, is entitled to judicial review thereof."

Early decisions under this statute interpreted the language as adopting the various formulations of "legal interest" and "legal wrong" then prevailing as constitutional requirements of standing.[4] But, in *Data Processing Service* v. *Camp,* 397 U. S. 150, and *Barlow* v. *Collins,* 397 U. S. 159, decided the same day, we held more broadly that persons had standing to obtain judicial review of federal agency action under § 10 of the APA where they had alleged that the challenged action had caused them "injury in fact," and where the alleged injury was to an interest "arguably within the zone of interests to be protected or regulated" by the statutes that the agencies were claimed to have violated.[5]

In *Data Processing,* the injury claimed by the petitioners consisted of harm to their competitive position in the computer-servicing market through a ruling by the Comptroller of the Currency that national banks might perform data-processing services for their customers. In *Barlow,* the petitioners were tenant farmers who claimed that certain regulations of the Secretary of Agriculture adversely affected their economic position *vis-à-vis* their landlords. These palpable economic injuries have long been recognized as sufficient to lay the basis for standing, with or without a specific statutory

---

[4] See, *e. g., Kansas City Power & Light Co.* v. *McKay,* 96 U. S. App. D. C. 273, 281, 225 F. 2d 924, 932; *Ove Gustavsson Contracting Co.* v. *Floete,* 278 F. 2d 912, 914; *Duba* v. *Schuetzle,* 303 F. 2d 570, 574. The theory of a "legal interest" is expressed in its extreme form in *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, 479–481. See also *Tennessee Electric Power Co.* v. *TVA,* 306 U. S. 118, 137–139.

[5] In deciding this case we do not reach any questions concerning the meaning of the "zone of interests" test or its possible application to the facts here presented.

provision for judicial review.[6]  Thus, neither *Data Processing* nor *Barlow* addressed itself to the question, which has arisen with increasing frequency in federal courts in recent years, as to what must be alleged by persons who claim injury of a noneconomic nature to interests that are widely shared.[7]  That question is presented in this case.

### III

The injury alleged by the Sierra Club will be incurred entirely by reason of the change in the uses to which Mineral King will be put, and the attendant change in the aesthetics and ecology of the area.  Thus, in referring to the road to be built through Sequoia National Park, the complaint alleged that the development "would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations."  We do not question that this type of harm may amount to an "injury in fact" sufficient to lay the basis for standing under § 10 of the APA. Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.  But the "injury in fact" test requires more than an injury to a cognizable

---

[6] See, *e. g., Hardin* v. *Kentucky Utilities Co.,* 390 U. S. 1, 7; *Chicago* v. *Atchison, T. & S. F. R. Co.,* 357 U. S. 77, 83; *FCC* v. *Sanders Bros. Radio Station, supra,* at 477.

[7] No question of standing was raised in *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402.  The complaint in that case alleged that the organizational plaintiff represented members who were "residents of Memphis, Tennessee who use Overton Park as a park land and recreation area and who have been active since 1964 in efforts to preserve and protect Overton Park as a park land and recreation area."

interest. It requires that the party seeking review be himself among the injured.

The impact of the proposed changes in the environment of Mineral King will not fall indiscriminately upon every citizen. The alleged injury will be felt directly only by those who use Mineral King and Sequoia National Park, and for whom the aesthetic and recreational values of the area will be lessened by the highway and ski resort. The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents.[8]

---

[8] The only reference in the pleadings to the Sierra Club's interest in the dispute is contained in paragraph 3 of the complaint, which reads in its entirety as follows:

"Plaintiff Sierra Club is a non-profit corporation organized and operating under the laws of the State of California, with its principal place of business in San Francisco, California since 1892. Membership of the club is approximately 78,000 nationally, with approximately 27,000 members residing in the San Francisco Bay Area. For many years the Sierra Club by its activities and conduct has exhibited a special interest in the conservation and the sound maintenance of the national parks, game refuges and forests of the country, regularly serving as a responsible representative of persons similarly interested. One of the principal purposes of the Sierra Club is to protect and conserve the national resources of the Sierra Nevada Mountains. Its interests would be vitally affected by the acts hereinafter described and would be aggrieved by those acts of the defendants as hereinafter more fully appears."

In an *amici curiae* brief filed in this Court by the Wilderness Society and others, it is asserted that the Sierra Club has conducted regular camping trips into the Mineral King area, and that various members of the Club have used and continue to use the area for recreational purposes. These allegations were not contained in the pleadings, nor were they brought to the attention of the Court

The Club apparently regarded any allegations of individualized injury as superfluous, on the theory that this was a "public" action involving questions as to the use of natural resources, and that the Club's longstanding concern with and expertise in such matters were sufficient to give it standing as a "representative of the public." [9] This theory reflects a misunderstanding of our cases involving so-called "public actions" in the area of administrative law.

The origin of the theory advanced by the Sierra Club may be traced to a dictum in *Scripps-Howard Radio v. FCC,* 316 U. S. 4, in which the licensee of a radio station in Cincinnati, Ohio, sought a stay of an order of the FCC allowing another radio station in a nearby city to change its frequency and increase its range. In discussing its power to grant a stay, the Court noted that "these private litigants have standing only as representatives of the public interest." *Id.,* at 14. But that observation did not describe the basis upon which the appellant was allowed to obtain judicial review as a "person aggrieved" within the meaning of the statute involved in that case,[10] since Scripps-

of Appeals. Moreover, the Sierra Club in its reply brief specifically declines to rely on its individualized interest, as a basis for standing. See n. 15, *infra.* Our decision does not, of course, bar the Sierra Club from seeking in the District Court to amend its complaint by a motion under Rule 15, Federal Rules of Civil Procedure.

[9] This approach to the question of standing was adopted by the Court of Appeals for the Second Circuit in *Citizens Committee for the Hudson Valley* v. *Volpe,* 425 F. 2d 97, 105:

"We hold, therefore, that the public interest in environmental resources—an interest created by statutes affecting the issuance of this permit—is a legally protected interest affording these plaintiffs, as responsible representatives of the public, standing to obtain judicial review of agency action alleged to be in contravention of that public interest."

[10] The statute involved was § 402 (b) (2) of the Communications Act of 1934, 48 Stat. 1093.

Howard was clearly "aggrieved" by reason of the economic injury that it would suffer as a result of the Commission's action.[11] The Court's statement was, rather, directed to the theory upon which Congress had authorized judicial review of the Commission's actions. That theory had been described earlier in *FCC* v. *Sanders Bros. Radio Station,* 309 U. S. 470, 477, as follows:

> "Congress had some purpose in enacting § 402 (b)(2). It may have been of opinion that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license. It is within the power of Congress to confer such standing to prosecute an appeal."

Taken together, *Sanders* and *Scripps-Howard* thus established a dual proposition: the fact of economic injury is what gives a person standing to seek judicial review under the statute, but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate.[12] It was in the latter sense that the "standing" of the appellant in *Scripps-Howard* existed only as a "representative of the public interest." It is in a similar sense that we have used the phrase "private attorney general" to

---

[11] This much is clear from the *Scripps-Howard* Court's citation of *FCC* v. *Sanders Bros. Radio Station,* 309 U. S. 470, in which the basis for standing was the competitive injury that the appellee would have suffered by the licensing of another radio station in its listening area.

[12] The distinction between standing to initiate a review proceeding, and standing to assert the rights of the public or of third persons once the proceeding is properly initiated, is discussed in 3 K. Davis, Adminstrative Law Treatise §§ 22.05–22.07 (1958).

describe the function performed by persons upon whom Congress has conferred the right to seek judicial review of agency action. See *Data Processing, supra,* at 154.

The trend of cases arising under the APA and other statutes authorizing judicial review of federal agency action has been toward recognizing that injuries other than economic harm are sufficient to bring a person within the meaning of the statutory language, and toward discarding the notion that an injury that is widely shared is *ipso facto* not an injury sufficient to provide the basis for judicial review.[13] We noted this development with approval in *Data Processing,* 397 U. S., at 154, in saying that the interest alleged to have been injured "may reflect 'aesthetic, conservational, and recreational' as well as economic values." But broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury.

Some courts have indicated a willingness to take this latter step by conferring standing upon organiza-

---

[13] See, *e. g., Environmental Defense Fund* v. *Hardin,* 138 U. S. App. D. C. 391, 395, 428 F. 2d 1093, 1097 (interest in health affected by decision of Secretary of Agriculture refusing to suspend registration of certain pesticides containing DDT); *Office of Communication of the United Church of Christ* v. *FCC,* 123 U. S. App. D. C. 328, 339, 359 F. 2d 994, 1005 (interest of television viewers in the programing of a local station licensed by the FCC); *Scenic Hudson Preservation Conf.* v. *FPC,* 354 F. 2d 608, 615–616 (interests in aesthetics, recreation, and orderly community planning affected by FPC licensing of a hydroelectric project); *Reade* v. *Ewing,* 205 F. 2d 630, 631–632 (interest of consumers of oleomargarine in fair labeling of product regulated by Federal Security Administration); *Crowther* v. *Seaborg,* 312 F. Supp. 1205, 1212 (interest in health and safety of persons residing near the site of a proposed atomic blast).

tions that have demonstrated "an organizational interest in the problem" of environmental or consumer protection. *Environmental Defense Fund* v. *Hardin*, 138 U. S. App. D. C. 391, 395, 428 F. 2d 1093, 1097.[14] It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review. See, *e. g.*, *NAACP* v. *Button*, 371 U. S. 415, 428. But a mere "interest in a problem," no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization "adversely affected" or "aggrieved" within the meaning of the APA. The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization, however small or short-lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the

---

[14] See *Citizens Committee for the Hudson Valley* v. *Volpe*, n. 9, *supra; Environmental. Defense Fund, Inc.* v. *Corps of Engineers*, 325 F. Supp. 728, 734–736; *Izaak Walton League* v. *St. Clair*, 313 F. Supp. 1312, 1317. See also *Scenic Hudson Preservation Conf.* v. *FPC, supra*, at 616:

"In order to insure that the Federal Power Commission will adequately protect the public interest in the aesthetic, conservational, and recreational aspects of power development, those who by their activities and conduct have exhibited a special interest in such areas, must be held to be included in the class of 'aggrieved' parties under § 313 (b) [of the Federal Power Act]."

In most, if not all, of these cases, at least one party to the proceeding did assert an individualized injury either to himself or, in the case of an organization, to its members.

same bona fide special interest would not also be entitled to do so.

The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process.[15] It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome. That goal would be undermined were we to construe the APA to authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process.[16] The principle that the Sierra Club would have us establish in this case would do just that.

---

[15] In its reply brief, after noting the fact that it might have chosen to assert individualized injury to itself or to its members as a basis for standing, the Sierra Club states:

"The Government seeks to create a 'heads I win, tails you lose' situation in which either the courthouse door is barred for lack of assertion of a private, unique injury or a preliminary injunction is denied on the ground that the litigant has advanced private injury which does not warrant an injunction adverse to a competing public interest. Counsel have shaped their case to avoid this trap."

The short answer to this contention is that the "trap" does not exist. The test of injury in fact goes only to the question of standing to obtain judicial review. Once this standing is established, the party may assert the interests of the general public in support of his claims for equitable relief. See n. 12 and accompanying text, *supra*.

[16] Every schoolboy may be familiar with Alexis de Tocqueville's famous observation, written in the 1830's, that "[s]carcely any political question arises in the United States that is not resolved, sooner or later, into a judicial question." 1 Democracy in America 280 (1945). Less familiar, however, is De Tocqueville's further observation that judicial review is effective largely because it is not

As we conclude that the Court of Appeals was correct in its holding that the Sierra Club lacked standing to maintain this action, we do not reach any other questions presented in the petition, and we intimate no view on the merits of the complaint. The judgment is

*Affirmed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

I share the views of my Brother BLACKMUN and would reverse the judgment below.

The critical question of "standing"[1] would be simplified and also put neatly in focus if we fashioned a federal rule that allowed environmental issues to be litigated before federal agencies or federal courts in the name of the inanimate object about to be despoiled, defaced, or invaded by roads and bulldozers and where injury is the subject of public outrage. Contemporary public con-

---

available simply at the behest of a partisan faction, but is exercised only to remedy a particular, concrete injury.

"It will be seen, also, that by leaving it to private interest to censure the law, and by intimately uniting the trial of the law with the trial of an individual, legislation is protected from wanton assaults and from the daily aggressions of party spirit. The errors of the legislator are exposed only to meet a real want; and it is always a positive and appreciable fact that must serve as the basis of a prosecution." *Id.*, at 102.

[1] See generally *Data Processing Service* v. *Camp,* 397 U. S. 150 (1970); *Barlow* v. *Collins,* 397 U. S. 159 (1970); *Flast* v. *Cohen,* 392 U. S. 83 (1968). See also MR. JUSTICE BRENNAN's separate opinion in *Barlow* v. *Collins, supra,* at 167. The issue of statutory standing aside, no doubt exists that "injury in fact" to "aesthetic" and "conservational" interests is here sufficiently threatened to satisfy the case-or-controversy clause. *Data Processing Service* v. *Camp, supra,* at 154.

cern for protecting nature's ecological equilibrium should lead to the conferral of standing upon environmental objects to sue for their own preservation. See Stone, Should Trees Have Standing?—Toward Legal Rights for Natural Objects, 45 S. Cal. L. Rev. 450 (1972). This suit would therefore be more properly labeled as *Mineral King* v. *Morton*.

Inanimate objects are sometimes parties in litigation. A ship has a legal personality, a fiction found useful for maritime purposes.[2] The corporation sole—a creature of ecclesiastical law—is an acceptable adversary and large fortunes ride on its cases.[3] The ordinary corporation is a "person" for purposes of the adjudicatory processes,

---

[2] *In rem* actions brought to adjudicate libelants' interests in vessels are well known in admiralty. G. Gilmore & C. Black, The Law of Admiralty 31 (1957). But admiralty also permits a salvage action to be brought in the name of the rescuing vessel. *The Camanche*, 8 Wall. 448, 476 (1869). And, in collision litigation, the first-libeled ship may counterclaim in its own name. *The Gylfe* v. *The Trujillo*, 209 F. 2d 386 (CA2 1954). Our case law has personified vessels:
"A ship is born when she is launched, and lives so long as her identity is preserved. Prior to her launching she is a mere congeries of wood and iron . . . . In the baptism of launching she receives her name, and from the moment her keel touches the water she is transformed . . . . She acquires a personality of her own." *Tucker* v. *Alexandroff*, 183 U. S. 424, 438.

[3] At common law, an officeholder, such as a priest or the king, and his successors constituted a corporation sole, a legal entity distinct from the personality which managed it. Rights and duties were deemed to adhere to this device rather than to the officeholder in order to provide continuity after the latter retired. The notion is occasionally revived by American courts. *E. g., Reid* v. *Barry*, 93 Fla. 849, 112 So. 846 (1927), discussed in Recent Cases, 12 Minn. L. Rev. 295 (1928), and in Note, 26 Mich. L. Rev. 545 (1928); see generally 1 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 50–53 (1963); 1 P. Potter, Law of Corporations 27 (1881).

whether it represents proprietary, spiritual, aesthetic, or charitable causes.[4]

So it should be as respects valleys, alpine meadows, rivers, lakes, estuaries, beaches, ridges, groves of trees, swampland, or even air that feels the destructive pressures of modern technology and modern life. The river, for example, is the living symbol of all the life it sustains or nourishes—fish, aquatic insects, water ouzels, otter, fisher, deer, elk, bear, and all other animals, including man, who are dependent on it or who enjoy it for its sight, its sound, or its life. The river as plaintiff speaks for the ecological unit of life that is part of it. Those people who have a meaningful relation to that body of water—whether it be a fisherman, a canoeist, a zoologist, or a logger—must be able to speak for the values which the river represents and which are threatened with destruction.

I do not know Mineral King. I have never seen it nor traveled it, though I have seen articles describing its proposed "development" [5] notably Hano, Protectionists vs. recreationists—The Battle of Mineral King,

---

[4] Early jurists considered the conventional corporation to be a highly artificial entity. Lord Coke opined that a corporation's creation "rests only in intendment and consideration of the law." *Case of Sutton's Hospital*, 77 Eng. Rep. 937, 973 (K. B. 1612). Mr. Chief Justice Marshall added that the device is "an artificial being, invisible, intangible, and existing only in contemplation of law." *Trustees of Dartmouth College* v. *Woodward,* 4 Wheat. 518, 636 (1819). Today, suits in the names of corporations are taken for granted.

[5] Although in the past Mineral King Valley has annually supplied about 70,000 visitor-days of simpler and more rustic forms of recreation—hiking, camping, and skiing (without lifts)—the Forest Service in 1949 and again in 1965 invited developers to submit proposals to "improve" the Valley for resort use. Walt Disney Productions won the competition and transformed the Service's idea into a mammoth project 10 times its originally proposed dimensions. For example,

N. Y. Times Mag., Aug. 17, 1969, p. 25; and Browning, Mickey Mouse in the Mountains, Harper's, March 1972, p. 65. The Sierra Club in its complaint alleges that "[o]ne of the principal purposes of the Sierra Club is to protect and conserve the national resources of the Sierra Nevada Mountains." The District Court held that this uncontested allegation made the Sierra Club "sufficiently aggrieved" to have "standing" to sue on behalf of Mineral King.

Mineral King is doubtless like other wonders of the Sierra Nevada such as Tuolumne Meadows and the John Muir Trail. Those who hike it, fish it, hunt it, camp

---

while the Forest Service prospectus called for an investment of at least $3 million and a sleeping capacity of at least 100, Disney will spend $35.3 million and will bed down 3,300 persons by 1978. Disney also plans a nine-level parking structure with two supplemental lots for automobiles, 10 restaurants and 20 ski lifts. The Service's annual license revenue is hitched to Disney's profits. Under Disney's projections, the Valley will be forced to accommodate a tourist population twice as dense as that in Yosemite Valley on a busy day. And, although Disney has bought up much of the private land near the project, another commercial firm plans to transform an adjoining 160-acre parcel into a "piggyback" resort complex, further adding to the volume of human activity the Valley must endure. See generally Note, Mineral King Valley: Who Shall Watch the Watchmen?, 25 Rutgers L. Rev. 103, 107 (1970); Thar's Gold in Those Hills, 206 The Nation 260 (1968). For a general critique of mass recreation enclaves in national forests see Christian Science Monitor, Nov. 22, 1965, p. 5, col. 1 (Western ed.). Michael Frome cautions that the national forests are "fragile" and "deteriorate rapidly with excessive recreation use" because "[t]he trampling effect alone eliminates vegetative growth, creating erosion and water runoff problems. The concentration of people, particularly in horse parties, on excessively steep slopes that follow old Indian or cattle routes, has torn up the landscape of the High Sierras in California and sent tons of wilderness soil washing downstream each year." M. Frome, The Forest Service 69 (1971).

in it, frequent it, or visit it merely to sit in solitude and wonderment are legitimate spokesmen for it, whether they may be few or many. Those who have that intimate relation with the inanimate object about to be injured, polluted, or otherwise despoiled are its legitimate spokesmen.

The Solicitor General, whose views on this subject are in the Appendix to this opinion, takes a wholly different approach. He considers the problem in terms of "government by the Judiciary." With all respect, the problem is to make certain that the inanimate objects, which are the very core of America's beauty, have spokesmen before they are destroyed. It is, of course, true that most of them are under the control of a federal or state agency. The standards given those agencies are usually expressed in terms of the "public interest." Yet "public interest" has so many differing shades of meaning as to be quite meaningless on the environmental front. Congress accordingly has adopted ecological standards in the National Environmental Policy Act of 1969, Pub. L. 91–190, 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*, and guidelines for agency action have been provided by the Council on Environmental Quality of which Russell E. Train is Chairman. See 36 Fed. Reg. 7724.

Yet the pressures on agencies for favorable action one way or the other are enormous. The suggestion that Congress can stop action which is undesirable is true in theory; yet even Congress is too remote to give meaningful direction and its machinery is too ponderous to use very often. The federal agencies of which I speak are not venal or corrupt. But they are notoriously under the control of powerful interests who manipulate them through advisory committees, or friendly working relations, or who have that natural affinity with the agency

which in time develops between the regulator and the regulated.[6]   As early as 1894, Attorney General Olney predicted that regulatory agencies might become "indus-

---

[6] The federal budget annually includes about $75 million for underwriting about 1,500 advisory committees attached to various regulatory agencies.   These groups are almost exclusively composed of industry representatives appointed by the President or by Cabinet members.   Although public members may be on these committees, they are rarely asked to serve.   Senator Lee Metcalf warns: "Industry advisory committees exist inside most important federal agencies, and even have offices in some.   Legally, their function is purely as kibitzer, but in practice many have become internal lobbies—printing industry handouts in the Government Printing Office with taxpayers' money, and even influencing policies.   Industry committees perform the dual function of stopping government from finding out about corporations while at the same time helping corporations get inside information about what government is doing.   Sometimes, the same company that sits on an advisory council that obstructs or turns down a government questionnaire is precisely the company which is withholding information the government needs in order to enforce a law."   Metcalf, The Vested Oracles: How Industry Regulates Government, 3 The Washington Monthly, July 1971, p. 45.   For proceedings conducted by Senator Metcalf exposing these relationships, see Hearings on S. 3067 before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 91st Cong., 2d Sess. (1970); Hearings on S. 1637, S. 1964, and S. 2064 before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 92d Cong., 1st Sess. (1971).

The web spun about administrative agencies by industry representatives does not depend, of course, solely upon advisory committees for effectiveness.   See Elman, Administrative Reform of the Federal Trade Commission, 59 Geo. L. J. 777, 788 (1971); Johnson, A New Fidelity to the Regulatory Ideal, 59 Geo. L. J. 869, 874, 906 (1971); R. Berkman & K. Viscusi, Damming The West, The Ralph Nader Study Group Report on The Bureau of Reclamation 155 (1971); R. Fellmeth, The Interstate Commerce Omission, The Ralph Nader Study Group Report on the Interstate Commerce Commission and Transportation 15–39 and *passim* (1970); J. Turner, The Chemical Feast, The Ralph Nader Study Group Report on Food

try-minded," as illustrated by his forecast concerning the Interstate Commerce Commission:

> "The Commission . . . is, or can be made, of great use to the railroads. It satisfies the popular clamor for a government supervision of railroads, at the same time that that supervision is almost entirely nominal. Further, the older such a commission gets to be, the more inclined it will be found to take the business and railroad view of things." M. Josephson, The Politicos 526 (1938).

Years later a court of appeals observed, "the recurring question which has plagued public regulation of industry [is] whether the regulatory agency is unduly oriented toward the interests of the industry it is designed to regulate, rather than the public interest it is designed to protect." *Moss* v. *CAB*, 139 U. S. App. D. C. 150, 152, 430 F. 2d 891, 893. See also *Office of Communication of the United Church of Christ* v. *FCC*, 123 U. S. App. D. C. 328, 337–338, 359 F. 2d 994, 1003–1004; *Udall* v. *FPC*, 387 U. S. 428; *Calvert Cliffs' Coordinating Committee, Inc.* v. *AEC*, 146 U. S. App. D. C. 33, 449 F. 2d 1109; *Environmental Defense Fund, Inc.* v. *Ruckelshaus*, 142 U. S. App. D. C. 74, 439 F. 2d 584; *Environmental Defense Fund, Inc.* v. *HEW*, 138 U. S. App. D. C. 381, 428 F. 2d 1083; *Scenic Hudson Preservation Conf.* v. *FPC*, 354 F. 2d 608, 620. But see Jaffe, The Federal Regulatory Agencies In Perspective: Administrative Limitations In A Political Setting, 11 B. C. Ind. & Com. L. Rev. 565 (1970) (labels "industry-mindedness" as "devil" theory).

---

Protection and the Food and Drug Administration *passim* (1970); Massel, The Regulatory Process, 26 Law & Contemp. Prob. 181, 189 (1961); J. Landis, Report on Regulatory Agencies to the President-Elect 13, 69 (1960).

The Forest Service—one of the federal agencies behind the scheme to despoil Mineral King—has been notorious for its alignment with lumber companies, although its mandate from Congress directs it to consider the various aspects of multiple use in its supervision of the national forests.[7]

---

[7] The Forest Reserve Act of 1897, 30 Stat. 35, 16 U. S. C. § 551, imposed upon the Secretary of the Interior the duty to "preserve the [national] forests . . . from destruction" by regulating their "occupancy and use." In 1905 these duties and powers were transferred to the Forest Service created within the Department of Agriculture by the Act of Feb. 1, 1905, 33 Stat. 628, 16 U. S. C. § 472. The phrase "occupancy and use" has been the cornerstone for the concept of "multiple use" of national forests, that is, the policy that uses other than logging were also to be taken into consideration in managing our 154 national forests. This policy was made more explicit by the Multiple-Use Sustained-Yield Act of 1960, 74 Stat. 215, 16 U. S. C. §§ 528–531, which provides that competing considerations should include outdoor recreation, range, timber, watershed, wildlife, and fish purposes. The Forest Service, influenced by powerful logging interests, has, however, paid only lip service to its multiple-use mandate and has auctioned away millions of timberland acres without considering environmental or conservational interests. The importance of national forests to the construction and logging industries results from the type of lumber grown therein which is well suited to builders' needs. For example, Western acreage produces Douglas fir (structural support) and ponderosa pine (plywood lamination). In order to preserve the total acreage and so-called "maturity" of timber, the annual size of a Forest Service harvest is supposedly equated with expected yearly reforestation. Nonetheless, yearly cuts have increased from 5.6 billion board feet in 1950 to 13.74 billion in 1971. Forestry professionals challenge the Service's explanation that this harvest increase to 240% is not really overcutting but instead has resulted from its improved management of timberlands. "Improved management," answer the critics, is only a euphemism for exaggerated regrowth forecasts by the Service. N. Y. Times, Nov. 15, 1971, p. 48, col. 1. Recent rises in lumber prices have caused a new round of industry pressure to auction more federally owned timber. See Wagner, Resources Report/Lumber-

The voice of the inanimate object, therefore, should not be stilled. That does not mean that the judiciary takes over the managerial functions from the federal

men, conservationists head for new battle over government timber, 3 National J. 657 (1971).

Aside from the issue of how much timber should be cut annually, another crucial question is *how* lumber should be harvested. Despite much criticism, the Forest Service had adhered to a policy of permitting logging companies to "clearcut" tracts of auctioned acreage. "Clearcutting," somewhat analogous to strip mining, is the indiscriminate and complete shaving from the earth of all trees—regardless of size or age—often across hundreds of contiguous acres.

Of clearcutting, Senator Gale McGee, a leading antagonist of Forest Service policy, complains: "The Forest Service's management policies are wreaking havoc with the environment. Soil is eroding, reforestation is neglected if not ignored, streams are silting, and clearcutting remains a basic practice." N. Y. Times, Nov. 14, 1971, p. 60, col. 2. He adds: "In Wyoming . . . the Forest Service is very much . . . nursemaid . . . to the lumber industry . . . ." Hearings on Management Practices on the Public Lands before the Subcommittee on Public Lands of the Senate Committee on Interior and Insular Affairs, pt. 1, p. 7 (1971).

Senator Jennings Randolph offers a similar criticism of the leveling by lumber companies of large portions of the Monongahela National Forest in West Virginia. *Id.*, at 9. See also 116 Cong. Rec. 36971 (reprinted speech of Sen. Jennings Randolph concerning Forest Service policy in Monongahela National Forest). To investigate similar controversy surrounding the Service's management of the Bitterroot National Forest in Montana, Senator Lee Metcalf recently asked forestry professionals at the University of Montana to study local harvesting practices. The faculty group concluded that public dissatisfaction had arisen from the Forest Service's "overriding concern for sawtimber production" and its "insensitivity to the related forest uses and to the . . . public's interest in environmental values." S. Doc. No. 91–115, p. 14 (1970). See also Behan, Timber Mining: Accusation or Prospect?, American Forests, Nov. 1971, p. 4 (additional comments of faculty participant); Reich, The Public and the Nation's Forests, 50 Calif. L. Rev. 381–400 (1962).

Former Secretary of the Interior Walter Hickel similarly faulted clearcutting as excusable only as a money-saving harvesting practice

agency. It merely means that before these priceless bits of Americana (such as a valley, an alpine meadow, a river, or a lake) are forever lost or are so transformed as to be reduced to the eventual rubble of our urban environment, the voice of the existing beneficiaries of these environmental wonders should be heard.[8]

---

for large lumber corporations. W. Hickel, Who Owns America? 130 (1971). See also Risser, The U. S. Forest Service: Smokey's Strip Miners, 3 The Washington Monthly, Dec. 1971, p. 16. And at least one Forest Service study team shares some of these criticisms of clear-cutting. U. S. Dept. of Agriculture, Forest Management in Wyoming 12 (1971). See also Public Land Law Review Comm'n, Report to the President and to the Congress 44 (1970); Chapman, Effects of Logging upon Fish Resources of the West Coast, 60 J. of Forestry 533 (1962).

A third category of criticism results from the Service's huge backlog of delayed reforestation projects. It is true that Congress has underfunded replanting programs of the Service but it is also true that the Service and lumber companies have regularly ensured that Congress fully funds budgets requested for the Forest Service's "timber sales and management." M. Frome, The Environment and Timber Resources, in What's Ahead for Our Public Lands? 23, 24 (H. Pyles ed. 1970).

[8] Permitting a court to appoint a representative of an inanimate object would not be significantly different from customary judicial appointments of guardians ad litem, executors, conservators, receivers, or counsel for indigents.

The values that ride on decisions such as the present one are often not appreciated even by the so-called experts.

"A teaspoon of living earth contains 5 million bacteria, 20 million fungi, one million protozoa, and 200,000 algae. No living human can predict what vital miracles may be locked in this dab of life, this stupendous reservoir of genetic materials that have evolved continuously since the dawn of the earth. For example, molds have existed on earth for about 2 billion years. But only in this century did we unlock the secret of the penicillins, tetracyclines, and other antibiotics from the lowly molds, and thus fashion the most powerful and effective medicines ever discovered by man. Medical scientists still wince at the thought that we might have inadvertently wiped

Perhaps they will not win. Perhaps the bulldozers of "progress" will plow under all the aesthetic wonders of this beautiful land. That is not the present question. The sole question is, who has standing to be heard?

Those who hike the Appalachian Trail into Sunfish Pond, New Jersey, and camp or sleep there, or run the

---

out the rhesus monkey, medically, the most important research animal on earth. And who knows what revelations might lie in the cells of the blackback gorilla nesting in his eyrie this moment in the Virunga Mountains of Rwanda? And what might we have learned from the European lion, the first species formally noted (in 80 A. D.) as extinct by the Romans?

"When a species is gone, it is gone forever. Nature's genetic chain, billions of years in the making, is broken for all time." Conserve—Water, Land and Life, Nov. 1971, p. 4.

Aldo Leopold wrote in Round River 147 (1953):

"In Germany there is a mountain called the Spessart. Its south slope bears the most magnificent oaks in the world. American cabinetmakers, when they want the last word in quality, use Spessart oak. The north slope, which should be the better, bears an indifferent stand of Scotch pine. Why? Both slopes are part of the same state forest; both have been managed with equally scrupulous care for two centuries. Why the difference?

"Kick up the litter under the oaks and you will see that the leaves rot almost as fast as they fall. Under the pines, though, the needles pile up as a thick duff; decay is much slower. Why? Because in the Middle Ages the south slope was preserved as a deer forest by a hunting bishop; the north slope was pastured, plowed, and cut by settlers, just as we do with our woodlots in Wisconsin and Iowa today. Only after this period of abuse was the north slope replanted to pines. During this period of abuse something happened to the microscopic flora and fauna of the soil. The number of species was greatly reduced, i. e., the digestive apparatus of the soil lost some of its parts. Two centuries of conservation have not sufficed to restore these losses. It required the modern microscope, and a century of research in soil science, to discover the existence of these 'small cogs and wheels' which determine harmony or disharmony between men and land in the Spessart."

Allagash in Maine, or climb the Guadalupes in West Texas, or who canoe and portage the Quetico Superior in Minnesota, certainly should have standing to defend those natural wonders before courts or agencies, though they live 3,000 miles away. Those who merely are caught up in environmental news or propaganda and flock to defend these waters or areas may be treated differently. That is why these environmental issues should be tendered by the inanimate object itself. Then there will be assurances that all of the forms of life [9] which it represents will stand before the court—the pileated woodpecker as well as the coyote and bear, the lemmings as well as the trout in the streams. Those inarticulate members of the ecological group cannot speak. But those people who have so frequented the place as to know its values and wonders will be able to speak for the entire ecological community.

Ecology reflects the land ethic; and Aldo Leopold wrote in A Sand County Almanac 204 (1949), "The land ethic simply enlarges the boundaries of the community to include soils, waters, plants, and animals, or collectively: the land."

That, as I see it, is the issue of "standing" in the present case and controversy.

---

[9] Senator Cranston has introduced a bill to establish a 35,000-acre Pupfish National Monument to honor the pupfish which are one inch long and are useless to man. S. 2141, 92d Cong., 1st Sess. They are too small to eat and unfit for a home aquarium. But as Michael Frome has said:

"Still, I agree with Senator Cranston that saving the pupfish would symbolize our appreciation of diversity in God's tired old biosphere, the qualities which hold it together and the interaction of life forms. When fishermen rise up united to save the pupfish they can save the world as well." Field & Stream, Dec. 1971, p. 74.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

Extract From Oral Argument of the Solicitor General*

.     .     .     .     .

"As far as I know, no case has yet been decided which holds that a plaintiff which merely asserts that, to quote from the complaint here, its interest would be widely affected [a]nd that 'it would be aggrieved' by the acts of the defendant, has standing to raise legal questions in court.

"But why not? Do not the courts exist to decide legal questions? And are they not the most impartial and learned agencies that we have in our governmental system? Are there not many questions which must be decided by the courts? Why should not the courts decide any question which any citizen wants to raise?

"As the tenor of my argument indicates, this raises, I think, a true question, perhaps a somewhat novel question, in the separation of powers. . . .

"Ours is not a government by the Judiciary. It is a government of three branches, each of which was intended to have broad and effective powers subject to checks and balances. In litigable cases, the courts have great authority. But the Founders also intended that the Congress should have wide powers, and that the Executive Branch should have wide powers.

"All these officers have great responsibilities. They are not less sworn than are the members of this Court to uphold the Constitution of the United States.

"This, I submit, is what really lies behind the standing doctrine, embodied in those cryptic words 'case' and 'controversy' in Article III of the Constitution.

---

*Tr. of Oral Arg. 31–35.

"Analytically one could have a system of government in which every legal question arising in the core of government would be decided by the courts. It would not be, I submit, a good system.

"More important, it is not the system which was ordained and established in our Constitution, as it has been understood for nearly 200 years.

"Over the past 20 or 25 years, there has been a great shift in the decision of legal questions in our governmental operations into the courts. This has been the result of continuous whittling away of the numerous doctrines which have been established over the years, designed to minimize the number of governmental questions which it was the responsibility of the courts to consider.

"I've already mentioned the most ancient of all: case or controversy, which was early relied on to prevent the presentation of feigned issues to the court.

"But there are many other doctrines, which I cannot go into in detail: reviewability, justiciability, sovereign immunity, mootness in various aspects, statutes of limitations and laches, jurisdictional amount, real party in interest, and various questions in relation to joinder.

"Under all of these headings, limitations which previously existed to minimize the number of questions decided in courts, have broken down in varying degrees.

"I might also mention the explosive development of class actions, which has thrown more and more issues into the courts.

.    .    .    .    .

"If there is standing in this case, I find it very difficult to think of any legal issue arising in government which will not have to await one or more decisions of the Court before the administrator, sworn to uphold the law, can take any action. I'm not sure that this is good for the government. I'm not sure that it's good for the

courts. I do find myself more and more sure that it is not the kind of allocation of governmental power in our tripartite constitutional system that was contemplated by the Founders.

. . . . .

"I do not suggest that the administrators can act at their whim and without any check at all. On the contrary, in this area they are subject to continuous check by the Congress. Congress can stop this development any time it wants to."

MR. JUSTICE BRENNAN, dissenting.

I agree that the Sierra Club has standing for the reasons stated by my Brother BLACKMUN in Alternative No. 2 of his dissent. I therefore would reach the merits. Since the Court does not do so, however, I simply note agreement with my Brother BLACKMUN that the merits are substantial.

MR. JUSTICE BLACKMUN, dissenting.

The Court's opinion is a practical one espousing and adhering to traditional notions of standing as somewhat modernized by *Data Processing Service* v. *Camp,* 397 U. S. 150 (1970); *Barlow* v. *Collins,* 397 U. S. 159 (1970); and *Flast* v. *Cohen,* 392 U. S. 83 (1968). If this were an ordinary case, I would join the opinion and the Court's judgment and be quite content.

But this is not ordinary, run-of-the-mill litigation. The case poses—if only we choose to acknowledge and reach them—significant aspects of a wide, growing, and disturbing problem, that is, the Nation's and the world's deteriorating environment with its resulting ecological disturbances. Must our law be so rigid and our procedural concepts so inflexible that we render ourselves helpless when the existing methods and the traditional

concepts do not quite fit and do not prove to be entirely adequate for new issues?

The ultimate result of the Court's decision today, I fear, and sadly so, is that the 35.3-million-dollar complex, over 10 times greater than the Forest Service's suggested minimum, will now hastily proceed to completion; that serious opposition to it will recede in discouragement; and that Mineral King, the "area of great natural beauty nestled in the Sierra Nevada Mountains," to use the Court's words, will become defaced, at least in part, and, like so many other areas, will cease to be "uncluttered by the products of civilization."

I believe this will come about because: (1) The District Court, although it accepted standing for the Sierra Club and granted preliminary injunctive relief, was reversed by the Court of Appeals, and this Court now upholds that reversal. (2) With the reversal, interim relief by the District Court is now out of the question and a permanent injunction becomes most unlikely. (3) The Sierra Club may not choose to amend its complaint or, if it does desire to do so, may not, at this late date, be granted permission. (4) The ever-present pressure to get the project under way will mount. (5) Once under way, any prospect of bringing it to a halt will grow dim. Reasons, most of them economic, for not stopping the project will have a tendency to multiply. And the irreparable harm will be largely inflicted in the earlier stages of construction and development.

Rather than pursue the course the Court has chosen to take by its affirmance of the judgment of the Court of Appeals, I would adopt one of two alternatives:

1. I would reverse that judgment and, instead, approve the judgment of the District Court which recognized standing in the Sierra Club and granted preliminary relief. I would be willing to do this on condition that the Sierra Club forthwith amend its complaint to meet the

specifications the Court prescribes for standing. If Sierra Club fails or refuses to take that step, so be it; the case will then collapse. But if it does amend, the merits will be before the trial court once again. As the Court, *ante,* at 730 n. 2, so clearly reveals, the issues on the merits are substantial and deserve resolution. They assay new ground. They are crucial to the future of Mineral King. They raise important ramifications for the quality of the country's public land management. They pose the propriety of the "dual permit" device as a means of avoiding the 80-acre "recreation and resort" limitation imposed by Congress in 16 U. S. C. § 497, an issue that apparently has never been litigated, and is clearly substantial in light of the congressional expansion of the limitation in 1956 arguably to put teeth into the old, unrealistic five-acre limitation. In fact, they concern the propriety of the 80-acre permit itself and the consistency of the entire, enormous development with the statutory purposes of the Sequoia Game Refuge, of which the Valley is a part. In the context of this particular development, substantial questions are raised about the use of a national park area for Disney purposes for a new high speed road and a 66,000-volt power line to serve the complex. Lack of compliance with existing administrative regulations is also charged. These issues are not shallow or perfunctory.

2. Alternatively, I would permit an imaginative expansion of our traditional concepts of standing in order to enable an organization such as the Sierra Club, possessed, as it is, of pertinent, bona fide, and well-recognized attributes and purposes in the area of environment, to litigate environmental issues. This incursion upon tradition need not be very extensive. Certainly, it should be no cause for alarm. It is no more progressive than was the decision in *Data Processing* itself. It need only recognize the interest of one who has a provable,

sincere, dedicated, and established status. We need not fear that Pandora's box will be opened or that there will be no limit to the number of those who desire to participate in environmental litigation. The courts will exercise appropriate restraints just as they have exercised them in the past. Who would have suspected 20 years ago that the concepts of standing enunciated in *Data Processing* and *Barlow* would be the measure for today? And MR. JUSTICE DOUGLAS, in his eloquent opinion, has imaginatively suggested another means and one, in its own way, with obvious, appropriate, and self-imposed limitations as to standing. As I read what he has written, he makes only one addition to the customary criteria (the existence of a genuine dispute; the assurance of adversariness; and a conviction that the party whose standing is challenged will adequately represent the interests he asserts), that is, that the litigant be one who speaks knowingly for the environmental values he asserts.

I make two passing references:

1. The first relates to the Disney figures presented to us. The complex, the Court notes, will accommodate 14,000 visitors *a day* (3,100 overnight; some 800 employees; 10 restaurants; 20 ski lifts). The State of California has proposed to build a new road from Hammond to Mineral King. That road, to the extent of 9.2 miles, is to traverse Sequoia National Park. It will have only two lanes, with occasional passing areas, but it will be capable, it is said, of accommodating 700–800 vehicles per hour and a peak of 1,200 per hour. We are told that the State has agreed not to seek any further improvement in road access through the park.

If we assume that the 14,000 daily visitors come by automobile (rather than by helicopter or bus or other known or unknown means) and that each visiting automobile carries four passengers (an assumption, I am

sure, that is far too optimistic), those 14,000 visitors will move in 3,500 vehicles. If we confine their movement (as I think we properly may for this mountain area) to 12 hours out of the daily 24, the 3,500 automobiles will pass any given point on the two-lane road at the rate of about 300 per hour. This amounts to five vehicles per minute, or an average of one every 12 seconds. This frequency is further increased to one every six seconds when the necessary return traffic along that same two-lane road is considered. And this does not include service vehicles and employees' cars. Is this the way we perpetuate the wilderness and its beauty, solitude, and quiet?

2. The second relates to the fairly obvious fact that any resident of the Mineral King area—the real "user"— is an unlikely adversary for this Disney-governmental project. He naturally will be inclined to regard the situation as one that should benefit him economically. His fishing or camping or guiding or handyman or general outdoor prowess perhaps will find an early and ready market among the visitors. But that glow of anticipation will be short-lived at best. If he is a true lover of the wilderness—as is likely, or he would not be near Mineral King in the first place—it will not be long before he yearns for the good old days when masses of people—that 14,000 influx per day—and their thus far uncontrollable waste were unknown to Mineral King.

Do we need any further indication and proof that all this means that the area will no longer be one "of great natural beauty" and one "uncluttered by the products of civilization?" Are we to be rendered helpless to consider and evaluate allegations and challenges of this kind because of procedural limitations rooted in traditional concepts of standing? I suspect that this may be the result of today's holding. As the Court points out, *ante,* at 738–739, other federal tribunals have

not felt themselves so confined.[1] I would join those progressive holdings.

The Court chooses to conclude its opinion with a footnote reference to De Tocqueville. In this environmental context I personally prefer the older and particularly pertinent observation and warning of John Donne.[2]

---

[1] *Environmental Defense Fund, Inc.* v. *Hardin,* 138 U. S. App. D. C. 391, 394–395, 428 F. 2d 1093, 1096–1097 (1970); *Citizens Committee for the Hudson Valley* v. *Volpe,* 425 F. 2d 97, 101–105 (CA2 1970), cert. denied, 400 U. S. 949; *Scenic Hudson Preservation Conf.* v. *FPC,* 354 F. 2d 608, 615–617 (CA2 1965); *Izaak Walton League* v. *St. Clair,* 313 F. Supp. 1312, 1316–1317 (Minn. 1970); *Environmental Defense Fund, Inc.* v. *Corps of Engineers,* 324 F. Supp. 878, 879–880 (DC 1971); *Environmental Defense Fund, Inc.* v. *Corps of Engineers,* 325 F. Supp. 728, 734–736 (ED Ark. 1970–1971); *Sierra Club* v. *Hardin,* 325 F. Supp. 99, 107–112 (Alaska 1971); *Upper Pecos Assn.* v. *Stans,* 328 F. Supp. 332, 333–334 (N. Mex. 1971); *Cape May County Chapter, Inc., Izaak Walton League* v. *Macchia,* 329 F. Supp. 504, 510–514 (N. J. 1971). See *National Automatic Laundry & Cleaning Council* v. *Shultz,* 143 U. S. App. D. C. 274, 278–279, 443 F. 2d 689, 693–694 (1971); *West Virginia Highlands Conservancy* v. *Island Creek Coal Co.,* 441 F. 2d 232, 234–235 (CA4 1971); *Environmental Defense Fund, Inc.* v. *HEW,* 138 U. S. App. D. C. 381, 383 n. 2, 428 F. 2d 1083, 1085 n. 2 (1970); *Honchok* v. *Hardin,* 326 F. Supp. 988, 991 (Md. 1971).

[2] "No man is an Iland, intire of itselfe; every man is a peece of the Continent, a part of the maine; if a Clod bee washed away by the Sea, Europe is the lesse, as well as if a Promontorie were, as well as if a Mannor of thy friends or of thine owne were; any man's death diminishes me, because I am involved in Mankinde; And therefore never send to know for whom the bell tolls; it tolls for thee." Devotions XVII.