**TOWN OF GROTON, a municipal corporation, et al.**

v.

**Melvin LAIRD, Individually and as Secretary of the Department of Defense, et al.**

**Civ. No. 15389.**

United States District Court,
D. Connecticut.

Dec. 11, 1972.

James T. Haviland, II, Groton, Conn., for plaintiffs.

Stewart H. Jones, U. S. Atty., Henry S. Cohn, Asst. U. S. Atty., Hartford, Conn., Frank Lewis, Naval Facilities Engineering Command, Philadelphia, Pa., Capt. Edward Fink, Naval Judge Advocate General Corps, Washington, D. C., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, Chief Judge.

Plaintiffs are the Town of Groton, Connecticut, and nine individual residents and taxpayers of the town. Alleging that defendants, officers in charge of the Naval Submarine Base located in Groton and their superiors in the Department of Defense, have failed to comply with the requirements of Section 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C),[1] they seek to enjoin all construction now being undertaken by the Navy on certain sites within the town.

### I.

■ The relevant facts may be briefly stated. The Naval Submarine Base is a large complex located in Groton, and there is little doubt that the Navy's plans to improve the efficient operation of the Base presented for consideration here will shortly result in an increase in the resident population in the town. The Navy has long been concerned about the scarcity of housing in the area available at a cost which does not exceed the housing allowance granted its employees

---

1. 42 U.S.C. § 4332(2)(C) provides:
"(2) all agencies of the Federal Government shall—
　　*　　*　　*　　*　　*
"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
"(i) the environmental impact of the proposed action,
"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
"(iii) alternatives to the proposed action,
"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes; . . . . . "

at the Base. In 1965, it began an initial exploration of possible sites in the general area and, out of ten surveyed, selected a lightly wooded and otherwise vacant plot known as Bailey Hill for the location of a 300-unit project.[2] In 1967, some of the sites were resurveyed, and the selection of Bailey Hill was reaffirmed. Consultation with Groton officials about specifics of the project has occurred intermittently since that time with attendant publicity in various local newspapers.[3] Controversy about the Bailey Hill housing began to bubble in April of this year, when townspeople living on nearby property began complaining that the project conflicted with the town's zoning provisions for the neighborhood and would change its character. In July, several members of the Town Planning Commission, who were attempting to prepare a new plan of land use development for Groton, met with officers from the Base, who discussed their own preliminary plans for future utilization of Navy property in the Groton area. At this meeting, several particular projects were pointed out, but the Commission did not receive a copy of the proposed plan, which the Navy apparently felt was too inchoate to be released. A month later, on August 23, 1972, Captain Hawkins, Commander of the Base, along with Lt. Comm. Thomas of the Northeast Regional Facilities Command, met with the same officials and disclosed the so-called Master Plan for all Navy activity in the area. This was a $120,000,000 proposal involving construction of various housing facilities, commercial buildings, a chapel—projects that would obviously have considerable impact on the town and its residents. Up to this point, no formal public statement as to environmental effect had been issued.

Several town officials, distressed by the Navy's plans, met with Secretary of the Navy Charles Ill in Washington. An agreement emerged from that meeting: the Navy would cease all construction except on the Bailey Hill project and would file within six months an environmental impact statement, as required by NEPA, covering everything included in the Master Plan. In return, the town would forbear bringing suit to stop the Bailey Hill construction, for which an impact statement would not be required. Several weeks later, in early October, town officials discovered that construction proceeding on a site located on Gungywump Road[4] was not, as they had thought, a Navy building but a credit union building for the use of Navy personnel owned by a civilian corporation. Claiming that continued work on this one building violated the agreement and rendered it void, plaintiffs sought a temporary restraining order in this court and requested that *all* construction be enjoined until an environmental impact statement on the Bailey Hill housing was filed.

The plaintiffs' request for a temporary restraining order was denied, but a hearing on the application for a preliminary injunction was consolidated with a trial on the merits. See Fed.R.Civ.P. 65(a)(2). Since I find that defend-

2. Plaintiffs' Exhibit 3 establishes that the project calls for construction of 220 units of two bedrooms and 80 of four bedrooms. Thus housing will be created for approximately 1200 people.

3. These consultations, plus subsequent meetings discussed *infra*, between Navy and town officials about both Bailey Hill and the Master Plan generally, occurred before this circuit held that NEPA imposes a requirement "that before a preliminary or threshold determination of significance is made the responsible agency must give notice to the public of the proposed major federal action and an opportunity to submit relevant facts which might bear upon the agency's threshold decision." Hanly v. Kleindienst, 471 F.2d 823, 836 (2d Cir. 1972), (*Hanly II*). Nonetheless, these repeated discussions satisfy the NEPA requirement as interpreted in that case.

4. The Gungywump Road site is just east of the Bailey Hill project but on the other side of Route 12, a major traffic artery. It, too, is within a mile of the Base.

**348**

ants' actions have complied with the directives of the statute, the prayer for injunctive relief must be denied.

## II.

 This court has jurisdiction over this controversy under 28 U.S.C. § 1331. Committee to Stop Rte. 7 v. Volpe, 346 F.Supp. 731 (D.Conn.1972). Defendants challenge the standing of plaintiffs to maintain this action, relying heavily on the recent decision in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). That reliance is misplaced. The Supreme Court there explicitly reaffirmed that "(a)esthetic and environmental well-being" are "interests . . . deserving of legal protection through the judicial process." Id. at 1366. See also, Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). It denied standing to the Sierra Club to contest a decision of the Forest Service to approve the construction of a gigantic resort in the Mineral King Valley because the club did not try to demonstrate that it or its members had personally suffered an injury, having "failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development." Id. Many of the club's members lived thousands of miles from the Mineral King Valley. Here, the Town of Groton alleges that the quality of the environment within its boundaries is being threatened by the defendants' actions. There can be no question that the town falls within the Sierra Club requirement that "the party seeking review must have himself suffered an injury," 92 S.Ct. at 1368. See also, City of Boston v. Volpe, 464 F.2d 254 (1st Cir. 1972). I, therefore, need not reach the question of whether the individual plaintiffs have standing.

## III.

 Section 102(2)(C) mandates that every federal agency undertaking any "major Federal actions significantly affecting the quality of the human environment" must file a detailed report examining, inter alia, the environmental impact of the action, unavoidable adverse environmental effects resulting from its implementation, and alternatives to the proposed action. This analysis has become known as the "environmental impact statement." More than a score of cases have established beyond question that failure to file the statement when one is required should result in an injunction against all further activity on the project until the agency has complied with the statute.[5] But an environmental impact statement is not required every time a federal agency does anything. Before an environmental impact statement is required, two threshold factors must exist: the proposed action must be "major," and its effect on the human environment must be "significant." Both parties agreed that the Bailey Hill project, whether considered separately or together with the credit union building, constitutes a "major" action. The issue presented here is whether the environmental effect of the project will be "significant." The Navy, following both NEPA and its own regulations, OPNAV 6240.2A (defendants' Exhibit C), analyzed the environmental effects of the project and determined that they would not be significant. It, therefore, did not issue an impact statement but retained for its own planning purposes its "Assessment" of the project's expected environmental effect, which it continually updates.

 This "threshold" determination of significance is a decision properly made in the first instance by the agency undertaking the action, but is reviewable by the courts. Hanly v. Mitch-

5. See cases cited in Note, Evolving Judicial Standards Under the National Environmental Policy Act and the Challenge of the Alaska Pipeline, 81 Yale L.J. 1592, 1596 n. 23 (1972).

ell,.460 ·F.2d 640, 644, 648 (2d Cir. 1972) (*Hanly I*). While the standard of review. of such a decision had been expressly left open in this circuit, it was sub judice at the time of the hearing on this matter, and *Hanly II, supra,* 471 F. 2d at 829, just recently decided, has now settled this issue. The proper standard is that set forth in Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which permits a reviewing court to set aside agency action only if it finds the action "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." Under this test, the Navy's determination that the project did not fall within the legislative purpose is clearly correct.

[8, 9] It is incontrovertible that NEPA requires administrative consideration of factors affecting "the quality of life for .city residents," [6] *Hanly I, supra,* 460 F.2d at 647, before decision is made that the proposed agency action will "significantly (affect) the quality of the human environment." In its determination of non-significance, the Navy's Assessment took into account the following factors: health, safety, local socio-economic factors, transportation systems, vehicular and air traffic patterns, utility systems, public services, and aesthetics. It concluded that "(n)o adverse effect on humans is anticipated." (Plaintiffs' Exhibit 6, "Environmental Assessment" § B(1)(a)). *Hanly II* holds that in making such determination

> "the agency in charge, although vested with broad discretion, should normally be required to review the proposed action in the light of at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area af-

fected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." *Id.,* 471 F.2d at 830.

While the second factor and the emphasis throughout *Hanly II* on the importance of measurement, see, e. g., *id.,* 471 F.2d at 833, suggests that it would have been preferable for the defendants to have spelled out the projected effects in greater detail, with an attempt at quantification to afford added assurance that the interests for which Congress expressed its solicitude were indeed being safeguarded,[7] it is apparent that their decision was guided by the strictures of the Act. The purpose of NEPA is to insure that all federal agencies inform every stage of their decision-making process with consideration of environmental factors, broadly understood.[8] The Navy's process of decision which was followed in this case is fairly designed to comply with this purpose. Its Assessment tracks section .102(2)(C) in its discussion of environmental effects: § B(1) corresponds to section 102(2)(C)(i) of the Act, § B(2) corresponds to subsection (ii), etc. What Senator Jackson, the statute's principal author, described as the "action-forcing procedures" embodied in the statute, 115 Cong.Rec. 19009 (July 10, 1969), have been honored here.

Any lack of fuller explanation of the grounds for their determination is readily understandable in view of the particular nature of the project under dispute. The construction of new dwellings to house additions to the town's population is contemplated by everyone. The Bailey Hill area is zoned for housing. The

---

6. Anything that influences urban dwellers' quality of life is relevant when weighing significance. Crime, noise, stench, congestion, and even existence of drug traffic, are all to be considered as environmental factors.

7. See also, Note, *supra,* 81 Yale L.J. at 1599–1601.

8. See the cogent analysis of NEPA and the requirements it imposes on federal agencies in Calvert Cliffs Coord. Comm. v. United States A. E. Comm'n, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1112–1115 (1971).

only difference between the Navy project and what the Town Zoning Commission has provided for the area's future is the number of units that the Navy will build on the tract. Testimony established that the land is zoned RS-12, whereas the Navy's project more closely approximates the standards of RMF (Residential Multi-Family). The difference between the two classifications is primarily that RS-12 imposes greater minimum set-back and dwelling area requirements. (Transcript at 31–34). Unlike Goose Hollow Foothills League v. Romney, 334 F.Supp. 877 (D.Or.1971), where a massive high-rise project was planned for an area containing no other high-rise buildings, the Navy project involves essentially the same use of Bailey Hill as that envisaged by the town.[9] The buildings will all be low-rise townhouses, with no more than six families occupying a single structure. (Transcript at 142). In designating the area for residential development, the Zoning Commission obviously foresaw the additional strain on roads, sewage, schools and other municipal services, which would inevitably result. The Navy also considered these factors in its Assessment (plaintiffs' Exhibit 6, § B(1) (g)), and the testimony of Lt. Comm. Thomas reveals that the Navy and the town have discussed thoroughly the problem of inadequate water facilities, and that the Navy has agreed to pay its fair share of the cost of constructing a new and fully adequate water delivery system. (Transcript at 146–48). The Navy cannot be faulted for failure to record in minute detail matters which had plainly been considered and approved by town authorities.

■■■■■ Plaintiffs spent considerable energy at the hearing attempting to demonstrate that the Navy project fails to conform to zoning requirements. See, e. g., direct examination of Lt. Comm. Thomas, Transcript at 149–51. Quite apart from the fact that the Navy is exempt from local zoning ordinances,[10] NEPA is not a sort of meta-zoning law. It is not designed to enshrine existing zoning regulations on the theory that their violation presents a threat to environmental values. NEPA may not be used by communities to shore up large lot and other exclusionary zoning devices that price out low and even middle income families. Cf. Note, Snob Zoning: Must a Man's Home be a Castle?, 69 Mich.L.Rev. 339 (1970); Note, Large Lot Zoning, 78 Yale L.J. 1418, 1420–21, 1427–28 (1969). It is evident that the Navy's decision to undertake the Bailey Hill project was strongly influenced by its desire to upgrade the "quality of the

9. The nearly-identical character of the Navy project and the town's plans for the area is of prime importance in assessing significance. For "(w)here conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change." *Hanly II, supra,* 471 F.2d at 831. Thus, the "two relevant factors" set forth in Hanly II and quoted earlier in this opinion, at 349 *supra,* lead almost by definition to a conclusion of non-significance.

10. See United States v. City of Chester, 144 F.2d 415 (3d Cir. 1944). There was testimony by Mr. Monte S. Lee, Town Planning Director, that the Navy project did not conform to all RMF requirements. (Transcript at 34–35). However, he also stated that there had been a series of negotiations between the Town Planning Commission and the Navy regarding plans for Bailey Hill, and that some of the Commission's suggestions regarding land use, e. g. providing for more recreation area within the project, were accepted by the Navy. (Transcript at 37–38). Moreover, Commander Clearwater, the officer in charge of construction for the Base, testified that the Navy redesigned plans for rear yard set back on the houses closest to existing homes in response to comments from town officials. (Transcript at 107). Lt. Comm. Thomas testified that the Navy has also improved its plans for a storm drainage system as a result of unexpected difficulty and has thereby incurred additional expense (Transcript at 170) and that of its own accord reduced the number of acres condemned for the project from 71 to 51.5 upon determination that the additional land was unnecessary. (Transcript at 155).

human environment" enjoyed by its employees. Its Assessment reported:

"II. ENVIRONMENTAL ASSESSMENT.

"A. *Proposed Action*

\* \* \* \* \* · \*

"6. Existing Navy housing units are fully occupied and have a long waiting list of applicants. The Naval Base is located in a summer resort area which places the purchase or rental of private accommodations beyond the financial capability of most military personnel. Vacancies can be found, however, in luxury type apartment houses at rentals ranging from $195.-00 per month for a one-bedroom apartment to $287.00 for a two bedroom apartment.

"7. The site proposed for condemnation is zoned residential."

In addition, in evaluating alternatives, the Assessment states: "At the present time military personnel are cautioned not to move their families to the area until government or private accommodations are assured." Assessment § D(3).

■ In enacting NEPA, Congress has accorded so high a place to environmental values that administrators must consider abandoning the proposed action entirely if their investigation of environmental impact shows unavoidable adverse effects. Natural Resources Defense Council v. Morton, 458 F.2d 827 (D.C. Cir. 1972); Committee to Stop Rte. 7 v. Volpe, *supra,* 346 F.Supp. 731, 738–739. While this consideration may turn out to have great force with regard to the remaining components of the Master Plan for which the Navy has agreed to file an impact statement in February 1973, it has no relevance to the Bailey Hill project. People have to have somewhere to live. There is no question that Groton has a serious housing shortage.[11]

■ Plaintiffs' counsel suggested that consideration should have been given to putting the project in Ledyard, an adjoining town which abuts on the north end of the Base. (Transcript at 144–145). Aside from the fact that this suggestion smacks of trying to dump the problem into someone else's backyard—residents of Ledyard might well voice many of the same objections plaintiffs have offered here—such a decision would very possibly have had adverse environmental consequences. The Bailey Hill project is less than one mile from where its residents will work. Relocating the site to a more sparsely populated area in another town would have increased the distance between home and work for several hundred employees of the Base. The result would have been increased necessity for use of automobiles, and thus increased consumption of fuel resources, as well as greater air pollution, traffic congestion, and psychic irritation due to longer commuting under unpleasant conditions. While the Navy has not reviewed site selection alternatives since 1967 (Transcript at 154–55), absent any evidence whatever that any other site became available or feasible after NEPA's effective date of January 1, 1970, there was more than substantial evidence to support the conclusion in the Assessment that "(t)he proposed action is the only alternative known." Assessment § D(4).

■ Plaintiffs directed a great deal of sound and fury at the Submarine Base Credit Union, presently being constructed on Gungywump Road. Both sides presented prolonged and conflicting testimony about whether town officials had knowledge that the credit union was going up on that site and

---

11. Mr. John Monahan, Assistant Superintendent of the Groton Schools in charge of pupil personnel, testified as to the impact of the Bailey Hill project on the school system. He stated that if any of the Bailey Hill residents moved there from living quarters elsewhere in Groton, he expected their housing to be filled immediately. In response to a question by the court, he stated:

"Q. There are no vacancies in Groton, is that it?

"A. They don't stay vacant very long." (Transcript at 88.)

whether Navy officials had ever informed the town about it. Plaintiffs' counsel stated the erection of the credit union tipped the "very delicate balance" represented by the agreement between the Navy and town officials and led to this litigation. (Transcript at 182–183, 198.) I find the importance attached to this matter quite mystifying. Plaintiffs' own witness, Mr. Robert Kress, testified that he was told during a meeting with Base officials on July 17, 1972, that a commercial structure was planned for that site. (Transcript at 213.) Lt. Comm. Thomas testified clearance had begun on the site in April (Transcript at 210), and it is inconceivable to me that town officials were not aware that construction of some sort was underway as trees were felled on the densely-wooded site. Why the existence of a credit union on the site rather than, say, a tavern or sports arena, should raise such wrath was never explained. The building is an ordinary office building, used only during the day and creating no traffic, noise, smell or other problem unusual to a simple commercial structure. I find that whatever efforts were made to communicate the plans and existence of this building to town officials and whatever their actual knowledge,[12] the fact that the building going up on the Gungywump Road site is to be occupied by a credit union is of no relevance to the issue of defendants' compliance with NEPA. Since I do not need to consider defendants' claim of laches, I likewise forego discussion of the effect of the discovery of the credit union building on the understanding between the town and the Navy.

On all of the evidence presented, I conclude that the defendants' decision to proceed with the project under consideration here without filing an environmental impact statement is neither illegal, arbitrary nor capricious; but, to the contrary, would be sustained even if measured by the "substantial evidence" test. Accordingly, the application for an injunction is denied.

So ordered.

12. Mayor J. N. Spillane testified that he had no knowledge that a credit union building was being constructed when the agreement was made. (Transcript at 202.) While there is no reason to question his honesty, Mr. Lee, the Town Planning Director, admitted that Navy officials pointed out the credit union building on a map during the July 17 meeting. (Transcript at 53.) In addition, government's Exhibit F contains numerous articles from local newspapers over a period of a year and a half reporting on various phases of planning and construction of the building.