**TOWNSHIP OF RIDLEY et al.**

v.

**Robert W. BLANCHETTE et al.**

**Civ. A. No. 74–2113.**

United States District Court,
E. D. Pennsylvania.

Oct. 12, 1976.

Roger Dale Morris, Swarthmore, Pa., for plaintiffs.

R. Paul Lessy, Chester, Pa., for Township of Ridley.

Judith Breen Soken, Philadelphia, Pa., for SEPTA.

Walter L. Foulke, Philadelphia, Pa., for defendants.

Kenneth A. Ritchie, Asst. U. S. Atty., Robert E. J. Curran, U. S. Atty., Philadelphia, Pa., for Secretary of Transportation.

## OPINION AND ORDER

FOGEL, District Judge.

Before us are cross motions for summary judgment which present the question of plaintiffs' right to enjoin defendants from constructing, and thereafter using a crossover on the railroad line running from Westchester-Media, Pennsylvania, through Ridley Township to Philadelphia, Pennsylvania. A prior request for a temporary restraining order was denied because of plaintiffs' failure to establish the necessary criteria for the grant of that extraordinary remedy, and consequently construction continued, notwithstanding the pendency of this action.[1]

1. We have been informed by the parties and their counsel that the crossover has been completed and is fully operational. It was urged by defendants that we therefore dismiss the mat-

The parties then proceeded to take discovery in support of their respective motions.[2] For the reasons set forth in this opinion, the motion of defendants for summary judgment will be granted, and plaintiffs' motion will be denied.

## I. PROCEDURAL AND FACTUAL HISTORY OF THE CASE

This controversy surfaced when workmen of the Penn Central Transportation Company (Penn Central), commenced construction of the crossover in Ridley Township, in the vicinity of Secane Station on the Media-Westchester line.[3] The residents of the area, whose houses abut the rear of the tracks had not been informed of the project prior to the start of construction. Upon inquiry, it was learned that the then current Secretary of the Department of Transportation, Claude Brinegar, had authorized a "demonstration project" under the authority of the Urban Mass Transportation Act of 1964, as amended, 49 U.S.C. §§ 1601, 1605, and had contracted with the Southeastern Pennsylvania Transportation Authority (SEPTA), for the design and construction of the facility. SEPTA was chosen because of its role as the central mass transit authority coordinating transportation in the region. SEPTA, in turn, subcontracted the construction to Penn Central, which owned the track, and operated trains on the commuter rail line for that Authority.

The Secane Crossover was conceived as one element of a demonstration project designed to improve service and increase efficiency of commuter rail facilities along the Media-Philadelphia corridor. The crossover is designed to enable outbound trains from Philadelphia to reverse direction after passing the Secane Station, thus eliminating additional travel to Media, the end of the line, the only other station at which a reversal of direction for the inbound trip to Philadelphia can be accomplished. The Secane turn-around also enables SEPTA to offer increased train service to passengers utilizing the eight stations closest to central Philadelphia, stations which, in fact, account for the heaviest volume of commuter traffic.

## II. CONTENTIONS OF THE PARTIES

Plaintiffs, are Ridley Township and several individuals who purportedly represent the class of residents in the vicinity of the crossover. As noted, there is no dispute with respect to the facts we have related. Plaintiffs' objection goes to the location of the crossover, which is within the existing two-track line situated to the rear of their houses in this heavily populated residential neighborhood. They maintain that the crossover should be located in the industrial section of the township, rather than in a residential area.

Their charges against defendants are grounded upon the following alleged illegal acts: *(1) failure of defendants to provide notice and a public hearing under the Urban Mass Transportation Act of 1964, as amended (UMTA), 49 U.S.C. § 1601 et seq.; (2) failure of defendants to comply with the provisions of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq.; (3) failure of defendants to comply with the provisions of the Metropolitan Transportation Authority Act of 1963 (MTAA), 66 P.S. § 2001 et seq., and (4) failure of defendants to comply with the applicable regulations*

ter as moot. Such a determination would be inappropriate, because (1) the construction was permitted to proceed at the risk that *use of the crossover would be prohibited*, and (2) *it is the use*, not the construction of the crossover which is the crux of the action. Thus, since the *use issue is prospective*, an active controversy is before us and the matter is not moot. *See Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

2. The parties have stipulated that the trial on the merits be consolidated with the application

for a preliminary injunction. *See* F.R.Civ.P. 65(a)(2).

3. The basic facts which are an essential backdrop for the pertinent legal issues, have been stipulated at oral argument by the parties. They are based on the joint final pretrial order, and the statements of fact in the memoranda accompanying the cross-motions for summary judgment.

*and executive orders under each of these statutes.*

The defendants have mounted a multipronged attack on the complaint. They allege that there are no material issues of fact, and that as a matter of law they should be awarded summary judgment for the following reasons:

*(1) Plaintiffs lack standing to maintain this action;*

*(2) Facts do not exist which can sustain plaintiffs' cause of action, as a matter of law, under UMTA, 49 U.S.C. § 1602(d) because:*

*(a) the Secane crossover does not substantially affect a community or its mass transportation service within the meaning of that section, and*

*(b) the case does not involve an application for a grant or loan as described by that section;*

*(3) Facts do not exist which can sustain plaintiffs' cause of action, as a matter of law, under UMTA, 49 U.S.C. § 1610, because the Secane crossover has no substantial impact on the environment;*

*(4) Facts do not exist which can sustain plaintiffs' cause of action, as a matter of law, under NEPA, 42 U.S.C. § 4321 et seq., because:*

*(a) the Secane crossover does not involve major federal action within the meaning of 42 U.S.C. § 4332(C); and*

*(b) the Secane crossover has no significant impact on the environment within the meaning of 42 U.S.C. § 4332(C);*

*(5) Facts do not exist which can sustain plaintiffs' cause of action, as a matter of law, under MTAA, 66 P.S. § 2001 et seq., because:*

*(a) in the absence of any federal cause of action, jurisdiction does not lie for a claim under MTAA, and*

*(b) the plaintiffs lack standing under MTAA;*

*(6) Facts do not exist which can sustain plaintiffs' cause of action against defendants for construction or operation of the Secane crossover, because plaintiffs have* attacked only the funding of the crossover, and not the manner in which it is to be built or operated.

Our analysis of the record, the pertinent statutes, regulations, executive orders and the controlling decisions lead us to conclude that plaintiffs have standing in this case, although they are not entitled to relief on the merits. Our reasons follow:

## A. STANDING

■ The effect of certain decisions of the Supreme Court in recent years, in the field of environmental law, has been the creation of broader rights which enable individual citizens to seek judicial review of those actions of public officials and of government agencies that affect those interests which may be termed "environmental" or "aesthetic". In *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) the Supreme Court held that economic injury, as such, was not an essential requirement for standing to sue. While the pinpointed holding of the Court in that case was that plaintiffs did not have standing, *because the Sierra Club had failed to allege that its members actually used the Mineral King area individually*, the opinion did recognize that

> [a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.

*Id.*, at 734, 92 S.Ct., at 1366. In the case at bar, the individual plaintiffs clearly allege that they, and the other citizens of the township will be individually affected by the change in the use of the railroad property. The requisite personal injury to satisfy the standards of *Sierra Club v. Morton, supra,* has therefore been alleged. *See also, United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The Township of Ridley, which shoulders the obligation, *inter alia,* of protecting the

health, safety and general welfare of its citizens (Complaint, ¶ 7), clearly qualifies as a proper organizational plaintiff. *See, McDowell v. Schlesinger,* 404 F.Supp. 221, 243 (W.D.Mo.1975); *Town of Groton v. Laird,* 353 F.Supp. 344, 348 (D.Conn.1972).

But the inquiry does not end there. A second prong to the test for standing requires, quite apart from a showing of personal injury, be it economic or otherwise, that plaintiffs demonstrate that "the interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute . . in question." *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Again, this issue raises two questions: *FIRST*: Is the statutory scheme one which is intended to preclude judicial review altogether? *SECOND*: If not, is judicial review available to these plaintiffs, in this court, on the basis of the action which has been instituted by them? The application of this prong of the test for standing requires us to examine the individual statutes set forth by plaintiffs as the bases for their claims for relief.

The defendants contend that plaintiffs lack standing under UMTA because the statute precludes judicial review of agency determinations under its provisions; they cite *South Suburban Safeway Lines Inc. v. City of Chicago,* 416 F.2d 535 (7th Cir. 1969) in support of their position. In *Safeway Lines* the Court of Appeals held that plaintiff lacked standing to challenge the discretionary determination of the Secretary of Housing and Urban Development to authorize a grant to finance the acquisition and construction of mass transportation facilities pursuant to section 1602(c) of the Act, because of the absence of a legislative purpose to protect the competitive interests of an independent transportation system. We find *Safeway Lines* to be inapplicable to the case at bar for two reasons. *FIRST*: plaintiffs before us are not competitors of the private party defendants—rather they are parties who are legitimately concerned about the environmental effects of the crossover. Section 1602(d)(2) of UMTA, which requires an applicant for a grant or loan to certify that he "has considered the economic and social effects of the project and its impact on the environment", gives its imprimatur to protection of the interests which plaintiffs seek to assert in this case, since they fall "within the zone . . . ." created by that statute. *SECOND*: defendants fail to discern the vital distinction between *our power to review discretionary* (albeit, misguided decisions by an administrative agency), *in contradistinction to our power to review illegal actions of the agency.* See, *Harmon v. Brucker,* 355 U.S. 579, 582, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958). Plaintiffs in the case at bar do not ask us to review the substantive decision of the Secretary of Transportation; rather, they contend that a mandatory provision of the statute has been violated because public hearings, which are required under section 1602(d)(1), were not held. *Accordingly, we find that plaintiffs do have standing to assert a violation of UMTA by defendants.*

It is also clear that plaintiffs' NEPA claims are within the zone of interests sought to be protected by the legislation. *See, Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (8th Cir. 1974) (*en banc*), in which plaintiff sought to enjoin further logging operations in the Boundary Waters Canoe Area until an impact statement complying with the requirements of NEPA was filed. The Court held that

> The environmental interests asserted by MPIRG are well within the zone of interests protected by NEPA. *United States v. SCRAP,* 412 U.S. 669, 686, n. 13, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

*Id.,* at 1324. *See also, National Wildlife Federation v. Morton,* 393 F.Supp. 1286 (D.D.C.1975), holding that plaintiff's interest in protecting public park areas from an overabundance of off-road vehicles clearly brought it within the "zone of interest" protected by NEPA. *Id.,* at 1289, n. 2. *Thus, plaintiffs also have standing to assert their claims under NEPA.*

We turn, therefore, to the substantive contentions of the parties.[4]

### B. URBAN MASS TRANSPORTATION ACT, 49 U.S.C. § 1602(d)— HEARING REQUIREMENTS

Plaintiffs allege that the notice and hearing required pursuant to the provisions of 49 U.S.C. § 1602(d) were never furnished, and that this violation, alone, necessitates enjoining completion of construction and subsequent use of the crossover. The parties have stipulated that no notice or hearing was provided in connection with the decision to construct the crossover. However, defendants allege that this section does not apply to this project. The pertinent portion of the statute reads as follows:

1602(d). Any application for a *grant or loan* under this chapter to finance the acquisition, construction, reconstruction, or improvement of facilities or equipment which will *substantially* affect a community or its mass transportation service shall include a certification that the applicant—

(1) has afforded an adequate opportunity for public hearings pursuant to adequate prior notice. . . .

(emphasis added).

UMTA sets up three distinct categories of projects with respect to financing and operation: *(1) those independently funded, (2) those funded by a grant, and (3) those entered into and funded through the contract route. The hearing requirement in section 1602(d) is addressed specifically to proceedings pursuant to a grant or loan. The question therefore is whether the hearing requirement applies to a project such as the Secane Crossover, which has been undertaken pursuant to a contract.*[5] Plaintiffs argue that no significance should be attached to the distinction among the various terms used by Congress in this statute, while defendants contend that the differences are critical.

UMTA was the product of deep Congressional concern about the problems facing urban regions in their efforts to improve commuter accessibility to cities. Several approaches were adopted in an effort to ameliorate these ills. One solution was to make federal funds available for financing projects undertaken by individual state or local mass transit systems. (Section 3 of UMTA, Act of July 9, 1964, Pub.L.No. 88–365, 78 Stat. 393, 49 U.S.C. § 1602). An applicant for federal funds under this section is required to certify that it has complied with the detailed procedural requirements of Section 1602(d), which include, *inter alia,* public hearings, consideration of the impact of the project on the environment, and a finding that the project is consistent with official plans for comprehensive development of the urban community.

Another provision of the Act contemplates research, development, and demonstration projects which are designed to

assist in the reduction of urban transportation needs, the improvement of mass transportation service, or the contribution of such service toward meeting total urban transportation needs at minimum cost.

UMTA, § 6, 49 U.S.C. § 1605(a). The stated purpose is to produce results which would benefit vicinities that are beyond the immediate locale of the project.[6] Under this section the Secretary of Transportation is required to consult with the Secretary of Commerce in order to coordinate their efforts, and is required to develop a program which would

(1) concern itself with all aspects of new systems of urban transportation for met-

---

**4.** Because we conclude that we do not have jurisdiction to hear the plaintiffs' claims of violation of MTAA, *see infra,* part E, we need not consider whether plaintiffs have standing under that statute.

**5.** It is not disputed that the Secane Crossover is a demonstration project undertaken pursuant to the contract with the Department of Trans-

portation to SEPTA. *See* Affidavit of Peter V. Young, at page 2, and accompanying exhibit (Contract between SEPTA and Department of Transportation, at page 2).

**6.** See 1964 U.S.Code Congressional and Admin. News, pp. 2569, 2583.

ropolitan areas of various sizes, including technological, financial, economic, governmental, and social aspects; (2) take into account the most advanced available technologies and materials; and (3) provide national leadership to efforts of States, localities, private industry, universities, and foundations.

49 U.S.C. § 1605(b).

*The 1968 amendment to UMTA did not alter this structural differentiation between the approaches of Section 1602 and Section 1605 of the Act.* Rather, the changes increased the funding available specifically for demonstration projects. Furthermore, amendments in 1970 served only to extend the authority of the Secretary to proceed under section 1605 without altering the structure of the Act. Pub.L.91–453, § 13(b), October 15, 1970, 84 Stat. 969. Thus it is clear from the Act itself, and from its legislative history and statutory evolution, that the differential in structure was deliberately and consistently reenacted by the Congress.

■ *Nor is it unreasonable for Congress to set, as it did, more stringent strictures upon non-federal projects than those placed upon projects undertaken by the Secretary of Transportation.* The control of funds, and the responsibility for specific utilization of federally-provided resources present a sharp dichotomy in the two situations. The Secretary is under a mandate to prepare

> a program of research, development, and demonstration of new systems of urban transportation that will carry people and goods within metropolitan areas speedily, safely, without polluting the air, and in a manner that will contribute to sound city planning.

49 U.S.C. § 1605(b). *However, there is no equivalent set of requirements which similarly affect state and local public agencies receiving funds under Section 1602.* It is therefore entirely rational for Congress to require that the Secretary demand specific showings of need and consideration of the anticipated environmental impact with respect to projects for which funds are sought under Section 1602, even though it does not

require an equivalent condition for projects funded under section 1605.

■ We therefore conclude that there is indeed significance in the statutory distinction, *FIRST*: between loans, grants, and contracts, and *SECOND*: between projects undertaken with federal money by state and local public agencies, and projects undertaken by the Secretary of Transportation with broader experimental-developmental-demonstrational purposes. *Thus, the project which is the subject matter of the instant suit, and which was without question undertaken pursuant to a contract as a demonstration project, is not subject to the notice and hearing requirements of section 1602(d).* Accordingly, the Secretary was not required to demand that public hearings be held.

Therefore, we need not construe that language of 49 U.S.C. § 1602(d) which goes to the issue of whether the proposed project "will *substantially affect* a community or its mass transportation service". (emphasis added).

### C. URBAN MASS TRANSPORTATION ACT, 49 U.S.C. § 1610— WRITTEN FINDINGS

Plaintiffs also assert a violation of the procedural requirements of Section 1610 of the UMTA. Section 1610 is a special provision of the Act which outlines the policy and the procedures the Secretary is to follow in evaluating the effect of projects on the environment. Subsection (a) states:

> It is hereby declared to be the national policy that special effort shall be made to preserve the natural beauty of the countryside, public park and recreation lands, wildlife and waterfowl refuges, and important historical and cultural assets, in the planning, designing, and construction of urban mass transportation projects *for which Federal assistance is provided pursuant to section 1602 of this title.*

49 U.S.C. § 1610(a) (emphasis added). Subsection (b) carries the following procedural mandate:

The Secretary shall review each transcript of hearing *submitted pursuant to section 1602(d) of this title* . . ..

49 U.S.C. § 1610(c) (emphasis added).

The defendants argue there is no cause of action based on section 1610 of the UMTA, because the Secane crossover has no substantial impact on the environment. While we are in accord with the conclusion, we cannot follow the route they have taken to reach that end. Section 1610 of the Act demands meticulous review of the applications submitted by state and local agencies under section 1602. *It does not relate at all to demonstration projects undertaken by the Secretary directly, or by contract under section 1605. Each of the subsections of section 1610 applies specifically to section 1602; indeed, reference is made specifically to section 1602(d)* (the notice and hearing subsection of section 1602). *On its face it does not apply to the case at bar. Moreover, this language remains unchanged consistently through several revisions of the act since its initial passage by Congress in 1964. Although the funding for section 1605 has been increased significantly, there has been no change in the pattern of distinction between projects spawned under section 1602, and those initiated under section 1605. Therefore, the environmental strictures of 49 U.S.C. § 1610 are inapplicable in this case.*

### D. NATIONAL ENVIRONMENTAL POLICY ACT, 42 U.S.C. § 4321, et seq.

Plaintiffs assert a violation of the National Environmental Policy Act as another basis for their suit. The purpose of that Act was to declare a national policy for the protection of the environment and to outline measures which would further that policy. 42 U.S.C. § 4321. That purpose was stated in the following language:

In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, *consistent with other essential considerations of national policy,* to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;

(3) *attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences* ;

(4) preserve *important* historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a *balance* between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

42 U.S.C. § 4331(b) (emphasis added). The specifics of this policy direction were outlined in section 4332, dealing with cooperation between agencies:

The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—

.    .    .    .    .

(C) include in every recommendation or report on proposals for legislation and *other major Federal actions significantly affecting* the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332 (emphasis added).

Plaintiffs contend that the Secane crossover is a "major Federal action[] significantly affecting the quality of the human environment"; hence, they argue that an environmental impact statement is required. Defendants admit that no impact statement was filed, but urge that none is required under the statute because: *(1)* this is not a *major* federal action, and *(2)* the crossover does not *significantly affect* the quality of the human environment.

■ It cannot be disputed that the Department of Transportation is the participant responsible for the threshold determination as to whether or not an environmental impact statement is required. *Hanly v. Kleindienst*, 471 F.2d 823, 828 (2d Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973). It is also clear, as noted previously, that this is a federal project. The questions facing the department were the following ones: *(1)* was the action "major"? *(2)* was there an effect on the human environment? and *(3)* was this effect "significant"? An uncontroverted affidavit of SEPTA's Manager of Program Development describes the preliminary evaluation of the Secane crossover project and the informal pursuit of opinions which were elicited from various regional and other planning organizations.[7] Another undisputed affidavit from the Executive Director of the Delaware Valley Regional Planning Commission, explains the background planning concepts and studies which led to the proposal for the Secane crossover.[8] From this uncontradicted evidence now in the record, we find that a determination was in fact made with respect to the necessity for an environmental impact statement. Thus, the instant case is in sharp contrast to those cases in which a determination prior to the commencement of a project had not been made, and an ensuing cover-up was manu-factured in an effort to justify the lack of a pre-commencement impact statement. *See, e. g., Named Individual Members of San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013 (5th Cir. 1971), *cert. denied*, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972).

### 1. STANDARD OF REVIEW

Therefore, the question before us is the standard to be applied by us in our review of the departmental decision which negated promulgation of an impact statement.

There is a sharp split of authority on this issue. The dispute has been fueled by the mixed "fact-and-law" nature of the questions faced by the agency. The definition of the terms "major" and "significant" is a matter of law; all well and good! The rabbit in the hat is that the findings which are the *sine qua non* before deciding that question of law, are of necessity *Findings of Fact which we must make*. Hence, the circle goes round.

The Second Circuit has held that judicial review of agency determinations of law is *de novo*, while factual determinations must be sustained unless they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Hanly v. Kleindienst*, 471 F.2d 823, 828 (2d Cir. 1972). This conclusion was based on § 10(e) of the Administrative Procedure Act (APA), 5 U.S.C. § 706, which had been held to be the proper statutory guide for review of similar agency decisions by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The *Hanly* Court pointed out the availability of a "rational basis" test for cases involving mixed questions of fact and law, *see, NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), but chose to apply the "arbitrary and capricious" standard, in reliance on the Supreme Court's determination in *Citizens to Preserve Overton Park, supra*, because it saw a close similarity be-

---

7. Affidavit of Peter V. Young.

8. Affidavit of Walter K. Johnson.

tween the Department of Transportation Act of 1966, 49 U.S.C. § 1653, reviewed in *Overton*, and NEPA, which it was then considering.

Other courts have reached different conclusions. Warrant in the record and a reasonable basis in law was the standard applied in *Citizens for Reid State Park v. Laird*, 336 F.Supp. 783, 789 (D.Me.1972). *De novo* review was invoked in *Scherr v. Volpe*, 336 F.Supp. 886, 888 (W.D.Wis.1971), aff'd, 466 F.2d 1027 (7th Cir. 1972). The arbitrary and capricious standard was adopted in *Goose Hollow Foothills League v. Romney*, 334 F.Supp. 877 (D.Or.1971); *Smith v. City of Cookeville*, 381 F.Supp. 100 (M.D.Tenn.1974); and *Duke City Lumber Co. v. Butz*, 382 F.Supp. 362 (D.D.C.1974). However, in *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 465 (5th Cir. 1973), the Court of Appeals reversed the district court's application of the arbitrariness standard, and remanded the case for evaluation under a "reasonableness" standard, *see also Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir. 1973); *Kisner v. Butz*, 350 F.Supp. 310 (N.D.W.Va.1972).

The Third Circuit has not yet squarely confronted this issue. However, it has provided a possible clue to its position in *Transcontinental Gas Pipe Line Corp. v. Hackensack Meadowlands Development Commission*, 464 F.2d 1358 (3d Cir. 1972). Because the Court determined that NEPA should not be applied retroactively it held that no impact statement was required. The court noted in dictum, however, with regard to the agency's position that a major action requiring an impact statement was not involved,

> that the approval of the construction of the facility in question is certainly not the type of "action" which most *reasonable men* would conclude, without any guidelines, to be either "major" or even an "action".

Id., at 1367 (emphasis added). *See,* Comment, Threshold Determination under the National Environmental Policy Act of 1969, 5 Rutgers Camden L.J. 380, 383, n. 16 (1974).

■ We have carefully reviewed the positions taken by the various district and circuit courts. We have also examined the guidelines issued by the Council on Environmental Quality, in 40 C.F.R. Part 1500. Finally, we have noted that the Supreme Court itself *actually* applied a *"reasonableness"* standard in *Overton*, despite its recital of the APA directive as to pure factual questions. *In light of the foregoing, and of the strong policy behind NEPA, we find that the "reasonableness" test is the most appropriate one for review of a threshold agency decision which negated the filing of an environmental impact statement. Accord, Concerned Residents of Buck Hill Falls v. Grant*, 388 F.Supp. 394, 398 (M.D. Pa.1975) (Muir, J.); *Borough of Morrisville v. Delaware River Basin Commission*, 399 F.Supp. 469, 478 (E.D.Pa.1975) (dictum; Newcomer, J.). *Contra, Union Mechling Corporation v. United States*, 390 F.Supp. 411, 432 (W.D.Pa.1974) (Scalera, J.).

### 2. *"MAJOR FEDERAL ACTION"*

The meaning of the terms *"major"* and *"significant"* has not been determined in this circuit, nor have those terms been defined with clarity in many other circuits. In some cases defendant has conceded that the project is "major". *See, e. g., Life of the Land v. Brinegar*, 485 F.2d 460, 465 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Town of Groton v. Laird*, 353 F.Supp. 344 (D.Conn. 1972). In other cases the project so obviously has been "major" as to obviate the necessity of reaching that issue. *See, e. g., Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013, 1025 (5th Cir. 1971). Several cases, however, have dealt with the question. In *Natural Resources Defense Council, Inc. v. Grant*, 341 F.Supp. 356 (E.D.N.C.1972), the court stated:

> A "major federal action" is federal action that requires substantial planning, time, resources, or expenditure. The Chicod Creek Watershed Project is a "major federal action". This project calls for sixty-

six miles of channelization and the expenditure of $1,503,831, $706,684 of which is to be federally funded. The project has been in the planning and preparation stages for several years. Many persons and agencies have become involved and concerned with this project, and the construction of this project will require a substantial amount of time and labor. Certainly this can be considered to be a "major federal action".

*Id.*, at 366–67. Plans for the watershed project involved an area of 35,100 acres in North Carolina, affected several thousand homes, many farms, and major stream channels totaling over sixty-six miles in length.

*Julis v. City of Cedar Rapids*, 349 F.Supp. 88 (N.D.Iowa 1972) concerned proposed street improvements which were designed to eliminate a bottleneck in the sole major east-west traffic artery in the city. Small slices of land, up to four-and-one-half feet wide, none of which were parkland or under occupied structures, were taken from ten property owners. Federal expenditures amounted to less than $300,000. No impact statement had been prepared, and opponents of the improvements were suing to preliminarily and permanently enjoin construction. The Court held that

by using the term "major" Congress reasonably intended to limit the Act to those federal actions of superior, larger and considerable importance, involving substantial expenditure of money, time and resources.

*Id.*, at 89. *A review of the evidence convinced the Court that the project clearly was not major federal action.*

In *San Francisco Tomorrow v. Romney*, 472 F.2d 1021 (9th Cir. 1973), amendatory contracts to increase the federal funding of a project to compensate for rising costs of land acquisition and relocation of displaced residents *were held not to constitute major federal action within the meaning of the Act, as a matter of law. Id., at 1025.*

*Those cases which have found the existence of major federal action have ordinarily involved highway extensions, large structures which alter the neighborhood, major dams or river projects, and other projects which can generally be characterized as involving sizeable federal funding (over one-half-million dollars, and usually. well over one million), large increments of time for the planning and construction stages, the displacement of many people or animals, or the reshaping of large areas of topography.*

■ *In sum, "major" is a term of reasonable connotation, and serves to differentiate between projects which do not involve sufficiently serious effects to justify the costs of completing an impact statement, and those projects with potential effects which appear to offset the costs in time and resources of preparing a statement. See cases cited, supra. See also, Hanly v. Kleindienst*, 471 F.2d 823 (2d Cir. 1972) (not required where the impact will be minor or unimportant, or where there is no sensible reason for making one); *Arlington Coalition v. Volpe*, 458 F.2d 1323 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972) (six lane highway—major action); *Ely v. Velde*, 451 F.2d 1130 (4th Cir. 1971) ($775,000 federal grant for construction of a correctional center—major action); *Kigner v. Butz*, 350 F.Supp. 310 (N.D.W.Va.1972) (4.3 miles of road in national forest—major action); *Izaak Walton League v. Schlesinger*, 337 F.Supp. 287 (D.D.C.1971) (licensing of nuclear power plant—major action); *Goose Hollow Foothills League v. Romney*, 334 F.Supp. 877 (D.Or.1971) ($3,000,000 high-rise student dormitory in neighborhood without any other high-rise buildings—major action).

### 3. "SIGNIFICANT ENVIRONMENTAL IMPACT"

The term "significant" has also been interpreted in many of the cases previously discussed. *Goose Hollow Foothills League, supra*, relied on the change in character of the neighborhood in ordering the agency to present its reasons for its failure to draft an impact statement. The implication was that the project was indeed significant in that area. *Citizens for Reid State Park v. Laird*, 336 F.Supp. 783 (D.Me.1972), viewed

"significant" in the sense of total environmental impact, which was broken down into long-term adverse effects, unavoidable short-term effects, unusual changes in noise levels, waste and sewage, and the degree of irreversible damage. In *Town of Groton v. Laird, supra*, the court's inquiry was directed to the issue of the novelty, if any, in the construction of new homes in a growing township; it observed that the chief complaint in fact appeared to be that the Navy was not following the exact pattern of the township zoning plan. *Hanly, supra*, held that ordinary common sense would be a sufficient guide. In *Natural Resources Defense Council, Inc. v. Grant, supra*, the Court said that

> The standard "significantly affecting the quality of the human environment" can be construed as having an important or meaningful effect, direct or indirect, upon a broad range of aspects of the human environment. The cumulative impact with other projects must be considered. Any action that substantially affects, beneficially or detrimentally, the depth or course of streams, plant life, wildlife habitats, fish and wildlife, and the soil and air "significantly affects the quality of the human environment".

341 F.Supp. at 367. Finally, in *Julis v. City of Cedar Rapids, supra*, the Court stated that the increase in traffic which plaintiffs contended would occur with the widening of the roadway was not significant, because the same increase probably would have occurred irrespective of the widening of the road; thus it held that increased traffic could not be ascribed to the effects of the road improvements along the short in-city stretch.

In addition to this case law, federal regulations promulgated by the Council on Environmental Quality suggest definitions for these two terms which are quite broad, but generally parallel to those hammered out

by the courts. 40 C.F.R. § 1500.6. *See also, Duke City Lumber Co. v. Butz*, 382 F.Supp. 362, 374, n. 36 (D.D.C.1974); *Smith v. City of Cookeville*, 381 F.Supp. 100, 109–10 (M.D. Tenn.1974).

### 4. THE FACTS OF THE INSTANT CASE

The posture of this suit is one in which the parties have submitted the matter to us on cross-motions for summary judgment. The standard under Rule 56 of the Federal Rules of Civil Procedure is clear in this circuit. Summary judgment may be granted only if there are no material facts in dispute. *Sarnoff v. Ciaglia*, 165 F.2d 167 (3d Cir. 1947). *Thus, the inquiry is whether there are any material facts which are in dispute within the context of the controlling legal principles.*

Affidavits have been submitted by all parties and by the witnesses for the parties who would have appeared at a trial of the case. Certain facts are uncontroverted. Other facts were given to us of record at oral argument. The location of the crossover is entirely within the existing and currently used railroad right-of-way near the Secane Station on the Media-West Chester commuter rail line.[9] Parallel rail lines about twelve feet apart, measured center to center, exist at that point.[10] The crossover includes two switches, one on each rail line, approximately 375 feet of track, signal connections, and an overhead wire to provide power to trains using the connecting section.[11] The signal connections are electronic or pressure-operated switches similar to those already in the track section for warning vehicular and pedestrian traffic on the several roads which cross the railroad right-of-way.[12] Approximately forty-two trains presently use the line daily. These trains carry about fifteen thousand passengers each way.[13] The crossover at Secane Station will be used by passenger commuter

---

**9.** Affidavit of Harry W. Hall.

**10.** Based on general information provided at oral argument.

**11.** Affidavit of Harry W. Hall.

**12.** Affidavit of Robert E. Rohrbacher.

**13.** Exhibits to Affidavit of Walter K. Johnson.

trains only; that use will be restricted to two trains travelling in each direction, or a total of four trains a day.[14] The subject commuter trains are electrically-powered units, with operator's controls at each end.[15] The crossover operation will involve the following steps: (1) opening one switch; (2) moving the train along the crossover rail segment; (3) opening the other switch; and (4) passing the train onto the rail line which operates in the opposite direction. The train will then rest for a short period which will not exceed five minutes during which time, *First*: one pantograph will be lowered; *Second*: the other will be raised to make contact with the overhead wire; and *Third*: the operator will pass from one end of the train to the other. The train will then move back into the station to permit passengers to board for the return trip.[16]

The purpose of the new crossover is to permit several daily commuter trains to reverse direction without having to traverse the entire length of the commuter route; the result is an increase in the speed of service on the line. The line is already heavily travelled, both by commuter and freight traffic.[17] The use of the crossover will occasion some change in the noise level, or at least in the noise characteristics, since trains will be in the vicinity for about five minutes at a low speed instead of the current twenty-to-thirty second high-speed passage which occurs at least forty times daily.[18] The actual noise level is in dispute; plaintiffs contend that it will be unbearable, while defendants claim that it will be substantially the same as, or less noisy than current levels.[19] Coupling or uncoupling of cars will not occur at the crossover, and diesel or freight trains will not use it. Similar crossovers are a commonplace occurrence along railroad lines throughout the nation, and many are operated in residential neighborhoods throughout the greater Philadelphia metropolitan area comparable to the area of Secane affected.[20] The construction of the crossover is federally funded *in toto* as a demonstration project pursuant to a contract with the Department of Transportation. The total contract cost allocated to the crossover is $168,973.[21]

Before issuing the project contract, the Department of Transportation engaged in studies of the rail commuter operations in the Philadelphia area.[22] The Secane crossover was one of the proposals generated by that study. The proposal was further investigated to determine whether there would be any significant effects on the environment, and whether it would meet the approval of the regional planning group. The specific location was dictated by a combination of factors, including: (1) cost; (2) geography; (3) current operation; (4) station location; and (5) safety. The relationship of the crossover to present street crossings and safety signals was of prime significance in arriving at the decision.[23] The Delaware Valley Regional Planning Council, the designated agency charged with the responsibility of review of federally assisted projects, found that the project would not have adverse impact on the environment.[24]

14. Affidavit of Harry W. Hall.

15. *Id.*

16. *Id.* *See also* Affidavit of James McAlea.

17. Affidavit of Harry W. Hall.

18. *Id.* Affidavit of James McAlea.

19. For plaintiffs, see Affidavits of Mary Rybicki, James McAlea and Frank McKeon, Jr. For defendants, see Affidavits of Harry W. Hall and Robert E. Rohrbacher.

20. Affidavit of Harry W. Hall.

21. Affidavit of Peter V. Young.

22. Affidavits of Peter V. Young, Harry W. Hall, and Walter K. Johnson, and supporting exhibits.

23. Affidavit of Robert E. Rohrbacher.

24. Affidavit of Walter K. Johnson and supporting exhibits.
   The Secretary of Transportation's authority to delegate this aspect of his reviewing function to state or local agencies is clear beyond doubt. *See, Pennsylvania Environmental Council, Inc. v. Bartlett*, 315 F.Supp. 238, 249 (M.D.Pa.1970) (dictum), aff'd., 454 F.2d 613 (3d Cir. 1971), and *National Forest Preservation Group v. Volpe*, 352 F.Supp. 123 (D.Mont. 1972).

In short, a determination was made that an environmental impact statement was not necessary.

We recognize that there are some factual disputes, particularly concerning the wisdom of the particular choice of location, the anticipated noise levels, and the potential effect of this crossover on property values along Secane Road. *However, none of the disputed facts are material with respect to the critical question: Is the project a major one?* The crossover involves approximately 375 feet of track which will be used by only four trains daily (of a total of approximately forty-two daily trains that use the Media-West Chester line); moreover, it involves a cost allocation of only $168,973. These undisputed facts, when superimposed against the facts of the cases cited in section 2, *supra*, lead us to conclude that the matter before us does not rise to the level of major federal action.

The disputed facts relate solely to the second issue—*is the human environment significantly affected as a result of this project?* While these factual disputes cannot be resolved on the record before us under the standards of F.R.Civ.P. 56, their resolution would, in any case, be inappropriate. We are reviewing an agency decision which involved alternative choices. Our *only* legitimate inquiry goes to the reasonableness of the decision reached in light of the opposing positions taken by the parties. *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973). This inquiry must be substantial and searching. *Hiram Clarke Civic Club, Inc. v. Lynn*, 476 F.2d 421 (5th Cir. 1973). For that reason, after examining the affidavits and the record then before us, we required additional affidavits and briefing from the parties. A review of the entire record, as augmented, convinces us that the agency conclusion which rules out any significant environmental impact as a result of the crossover is a reasonable one. Accordingly, there was no violation of NEPA by reason of the failure of the agency to prepare an environmental impact statement in this case.

*E. METROPOLITAN TRANSPORTATION AUTHORITY ACT OF 1963, 66 P.S. § 2001, et seq.*

Disposition of plaintiffs' claims under UMTA and NEPA eliminates all of the federal statutory causes of action in this matter. No diversity of citizenship exists between the parties, nor is there an independent basis for federal jurisdiction. The question which remains, therefore, is whether a state cause of action should be entertained under the doctrine of pendent jurisdiction in the absence of a federal question.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) is the decisional fountainhead of the doctrine of pendent jurisdiction. The Supreme Court, in that case, enumerated two distinct inquiries which must be made in considering the propriety of exercising pendent jurisdiction: *first*, whether we have the *power* to assume jurisdiction over the pendent claim; and *second*, whether the exercise of that power is appropriate, under the circumstances. *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). *See also, Aldinger v. Howard*, —— U.S. ——, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

The judicial power to hear state claims exists whenever there is a federal claim
> and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case". The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. [citation omitted] The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues there is *power* in federal courts to hear the whole.

*Gibbs, supra,* 383 U.S. at 725, 86 S.Ct. at 1138 (footnotes omitted; emphasis in the original).

The decision to hear a pendent state claim is one which falls within the discretionary powers of the District Court.

That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them [citation omitted]. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surefooted reading of applicable law. *Certainly, if the federal claims are dismissed before trial,* even though not insubstantial in a jurisdictional sense, *the state claims should be dismissed as well.*

*Id.,* at 726, 86 S.Ct. at 1139 (footnotes omitted; emphasis added).

Under this standard we will dismiss the plaintiffs' pendent state claims for lack of federal jurisdiction.

## III. CONCLUSION

We conclude that (1) the defendants have not violated the provisions of UMTA or NEPA; (2) we do not have jurisdiction over the claims arising under the MTAA; and (3) the defendants are entitled to summary judgment in their favor.[25] We will therefore grant the defendants' Motion for Summary Judgment, and deny plaintiffs' cross-motion for the same relief.

An appropriate Order will issue.

**25.** Our disposition of the case on the grounds upon which we have decided the matter, makes it unnecessary to consider defendants' final contention that the plaintiffs are not entitled to relief because they attack only the funding of the Secane Crossover, not the manner in which it has been built or is to be operated.