EMAS, J.
Constance Ryan, as personal representative of the Estate of David Collins (“Ryan”), appeals a summary final judgment entered in favor of National Marine Manufacturers Association (“NMMA”) and Oscar Beguiristain (“Beguiristain”). We affirm.
In anticipation of the Miami International Boat Show at the Miami Beach Convention Center in 2008, NMMA, the national trade association for the recreational boating industry, entered into an agreement with the Housing Authority of the City of Miami Beach (“the City”). The agreement provided NMMA the right to use a City-owned, private parking lot for the purpose of parking several tractor trailers used in conjunction with the boat show. Entitled a “Temporary License and Use Agreement” (“Agreement”), this Agreement was effective from January 28, 2008 through February 22, 2008.
On the afternoon of February 7, 2008, David Collins wandered onto the subject property, climbed under a parked and unhitched trailer, and fell asleep. Shortly thereafter, Beguiristain, an NMMA employee, drove his truck onto the property to unload one trailer and pick up another trailer. After unloading and unhitching the first trailer, he backed up his truck to the trailer under which Collins was sleeping, hitched the trailer to his truck, and pulled out, running over Collins and causing injuries which later led to his death. After an investigation, it was determined that Beguiristain was not aware Collins was under the truck. The investigation also revealed that, at the time of his death, Collins had a blood alcohol level of nearly three times the legal limit.[1] Beguiristain was not cited for the incident, but Collins’ mother Ryan, the personal representative of his estate, filed suit against Beguiristain and NMMA, alleging Beguiristain was negligent in failing to maintain a proper look-out during operation of the tractor-trailer and/or in failing to “check around and under the tractor-trailer so as to avoid striking a pedestrian in the vicinity,” causing him to run over Collins, resulting in his death.
*1003 NMMA and Beguiristain moved for summary judgment, asserting they were not liable for Collins’ death, pursuant to section 768.075(1), Florida Statutes (2009), which provides:
a person or organization owning or controlling an interest in real 'property, or an agent of such person or organization, shall not be held liable for any civil damages for death of or injury or damage to a trespasser upon the property when such trespasser was under the influence of alcoholic beverages with a blood-alcohol level of 0.08 percent or higher....[2]
(Emphasis added).
Ryan argued section 768.075 did not apply because NMMA and Beguiristain were licensees and did not control an interest in the property. The trial court found the immunity provision applicable, granted NMMA’s motion and entered final summary judgment in favor of NMMA and Beguiristain. This appeal followed.
Our standard of review is de novo, Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000), and summary judgment is proper only if, viewed in a light most favorable to the non-moving party, there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Id. In addition, whether a defendant in a negligence action owes a duty to the plaintiff is a question of law. Williams v. Davis, 974 So.2d 1052 (Fla.2007).
The sole question we must determine is whether, as a matter of law, NMMA and Beguiristain are entitled to the immunity provided by section 768.075, Florida Statutes.[3] Ryan argues that because the Agreement between NMMA and the City was a license, NMMA did not have exclusive control of the property and cannot avail itself of the immunity provision. NMMA asserts its Agreement with the City, although titled a “Temporary License and Use Agreement,” was actually a short-term lease, granting NMMA exclusive control of the property and thereby the protection afforded by the immunity provision.[4]
A review of the Agreement reveals the following relevant provisions:
— The Agreement is entitled “Temporary License and Use Agreement.”
— The Agreement describes a particular piece of property, which is identified by exact address and is described as the “the Premises”.
— The Agreement is for a set term beginning on a date certain and ending on a date certain (a total of *1004 26 days), referred to as “the Term” of the Agreement.
— The parties agreed that “this agreement constitutes a month-to-month agreement.”
— NMMA was required to pay a “security deposit” of $3445 at the time of execution of the Agreement.
— NMMA was required to “quit and deliver the Premises ... at the end of the term....”
— NMMA was required to pay “any and all sales and use taxes levied upon the use and occupancy of the Premises.”
— NMMA agreed “that it will occupy and maintain the Premises in a good condition” and “will not commit, or suffer to be committed, any waste of or on the Premises.”
— NMMA agreed that it “will not assign this Agreement, or any interest therein” and “may not sublease without the prior written agreement” of the City.
— NMMA was required to “properly maintain the gated entranceway and all vehicles coming on the Premises, and shall be responsible for all automobiles on the Premises at all times during this Agreement.”
— NMMA agreed that the City “shall have the right to enter upon the Premises at such times and at such places during reasonable business hours, for the purpose of inspecting the Premises or for any purpose whatsoever.”
— Nothing contained in the Agreement was to be construed as creating any relationship between the parties “other than the relationship of [the City] as ownerfiicensor and NMMA as licensee.”
— NMMA was required to provide a minimum of one million dollars in liability and personal property insurance coverage “related to NMMA’s possession of the Premises....”
— In the event NMMA failed to perform any of the terms and conditions of the Agreement, the City was required to give NMMA a five-day written notice to cure a default. The five-day written notice also applied “in the event that NMMA defaults in the payment of any of its rental payments.”
— In the event that the Premises could not be used as a parking facility, “NMMA shall have the right to terminate this Agreement upon five (5) days’ written notice to [the City] and any prepaid unused rent shall be returned to NMMA....”
It is clear from these provisions that NMMA was given far more than a revocable permission or privilege to enter upon the property. See Black’s Law Dictionary 1002 (9th ed.2009) (defining “license” as “[a] permission, usually revocable, to commit some act that would otherwise be unlawful; especially an agreement that it is lawful for the licensee to enter the li-censor’s land to do some act that would otherwise be illegal, such as hunting game”). The Agreement more closely approaches “[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration.” Black’s Law Dictionary 970 (9th ed.2009) (defining “lease”).
It may well be that the Agreement in question contains terms which are characteristic both of a license and a lease. *1005 However, we need not, and therefore do not, reach the larger question of whether the Agreement was in fact a license or a lease,[5] because the narrower question is whether the Agreement (be it a lease, a license, or something in between), establishes that NMMA was “controlling an interest in real property” at the time of the incident in question.[6] We answer that question in the affirmative.
Affirmed.

. In Florida, the legal limit for the offense of driving with an unlawful blood alcohol level is 0.08 or more grams of alcohol per 100 milliliters of blood. § 316.193(l)(b), Fla. Stat. The medical examiner’s toxicology report determined Collins’ alcohol level was 0.21.

. There are certain exceptions, such as gross negligence or intentional misconduct on the part of the person or organization, but those exceptions do not apply here.

. Although Ryan made additional arguments, we find they are without merit, and address only the applicability of section 768.075.

. Though not directly relevant to our decision, we note that whether the Agreement is a lease or a license would have collateral consequences in other contexts, since the property was owned by a municipality (the City of Miami Beach, which is not a party to this action). See, e.g., § 196.199(2)(a), .012, Fla. Stat. (2009); Sebring Airport Auth. v. McIntyre, 642 So.2d 1072 (Fla.1994) (holding public property leased by a private organization is not exempt from ad valorem taxation where operation is purely proprietary and serves no governmental purpose); accord Volusia Cnty. v. Daytona Beach Racing & Rec. Facilities Dist., 341 So.2d 498 (Fla.1976). Cf. Turner v. Fla. State Fair Auth., 974 So.2d 470 (Fla. 2d DCA 2008) (holding section 196.199 inapplicable because agreement was a license rather than a lease.)

. Of course, the mere fact that an agreement is entitled a "license” or contains a concluso-ry provision that the parties have a relationship of licensor and licensee, is not determinative. Rather, the proper characterization of the agreement is discerned by the actual terms, conditions, rights and obligations expressly set forth in the agreement. See e.g., Jabour v. Toppino, 293 So.2d 123 (Fla. 3d DCA 1974); Napoleon v. Glass, 229 So.2d 883 (Fla. 3d DCA 1969).

. Although the Agreement does not expressly provide that NMMA has “exclusive” use and possession of the property, see Outdoor Media of Pensacola, Inc. v. Santa Rosa Cnty., 554 So.2d 613, 616 (Fla. 1st DCA 1989) (determining that the subject agreement was a lease because the county granted the company "an exclusive right to place signs on county rights of way for a three-year period"), neither are we obliged to reach such a conclusion in order to determine (as we do) that the provisions of the Agreement described above sufficiently establish that, during the term of the Agreement, NMMA was "controlling an interest” in the property.