SALTER, J.
Midgard Management, Inc., a commercial property manager at a Miami Gardens multi-tenant office property, appeals a circuit court order granting summary judgment and monetary relief to one of the tenants (appellee Park Centre Med-Suites, LLC) on the grounds that Midgard lacked standing to prosecute an eviction action against Park Centre. A cross-appellant, Design Neuroscience Centers, LLC, also appeals that judgment. We reverse.

Facts and Procedural History

In 2006 and 2007, the owner of the office park conveyed its interests to twenty-eight limited liability companies as tenants in common. All of the tenants in common entered into a “Tenants in Common *304 Agreement” (the TIC Agreement) and a Property Management Agreement with a non-party, Mariner Property Management Services, LLC. Acting as an agent for the tenants in common, Mariner Property Management entered into a lease with Park Centre in June 2010. The term of the lease was to be five years, commencing in September 2010, and the rent was to be $10,792.00 per month. Section 11.1 of the lease prohibited assigning, subletting, transferring, or encumbering the lease, “or any interest therein,” without the prior written consent of the landlord. The same provision also required that, in the event of a written consent to an assignment or sublet, Park Centre would be required to pay any positive rent differential (a “Transfer Premium”) to the landlord. Upon any default in payment by Park Centre, the landlord was given the right to collect rent directly from a subtenant or assignee.
The same day the lease was entered into by Mariner Property Management and Park Centre, Park Centre entered into a “Management Services and License Agreement” whereby Park Centre granted rights of occupancy and use of all of Park Centre’s leased premises to cross-appellant, Design Neuroscience Centers (DNC), also for a term of five years (commencing on the same day as the Park Centre lease). The “management fee” payable by DNC was $17,625.00 per month — $6,833.00 per month more than Park Centre was to pay the owners for the premises.[1] That same day, Mariner Property Management, Park Centre, and DNC also entered into a “Subordination, NonDisturbance and Attornment Agreement” (SNDA), identified in the introduction as a “sublease subordination, nondisturbance and attornment agreement.” At various points in the SNDA, the “license agreement” was referred to as a “sublease,” and an attachment referred to the premises as the “Sublet Premises.” The “license agreement” also acknowledged that it “specifically overrides and cancels the prior lease agreement between [DNC] and [Mariner Property Management].” A sworn affidavit from one of the tenants in common stated that the actual DNC “license” agreement was not provided as required for review and approval.[2]
Shortly after the commencement date of the Park Centre lease and the license (or sublease) agreement with DNC, Mariner Property Management resigned from its duties as property manager because it had not been paid. Within a few months (by April 2011), the office park’s multi-million dollar mortgage loan was in default. At that point, a group of the tenants in common proposed the appellant, Midgard, as successor property manager. Midgard sent a written request for approval of its management contract to (a) all tenants in common, under the TIC Agreement, and (b) the mortgage lender, as contemplated in the mortgage loan and lease subordination provisions. None of the tenants in common objected before Midgard commenced the eviction against Park Centre and DNC in July 2011. The mortgage lender consented in writing to Midgard’s service as property manager.
*305 Midgard filed an action in county court to evict Park Centre as tenant and DNC as subtenant in possession for non-payment of over $96,000 in rent and “Transfer Premium” due under the lease. Upon motion by Midgard, the court ordered DNC to deposit its monthly payments into the registry of the court.[3]
In August 2011, the eviction case was transferred to the circuit court. There, Midgard’s lawsuit was met with affirmative defenses and counterclaims including, among others, a declaratory judgment action alleging that Midgard lacked standing to prosecute the eviction action.
Park Centre then moved for summary judgment on the standing issue. The motion alleged that Midgard had not obtained the unanimous written consent of all twenty-eight tenants in common regarding its management agreement, with the result that Midgard lacked authority to commence the eviction action against Park Centre and DNC. The trial court granted Park Centre’s motion for a declaratory judgment, finding that: “unanimous con-sentís] of all Tenants in Common were required before Midgard could be hired as the new property manager in order to become the landlords’ agent;” unanimous consent was not obtained; and “Midgard was not properly hired as the property manager under the TIC Agreement, and thus Midgard did not become the landlords’ agent.” The court’s summary judgment further determined that Midgard lacked authority to send a default notice to Park Centre and to file suit against Park Centre.
Based on these rulings, the trial court directed the clerk to disburse to Park Cen-tre’s counsel those “surplus funds” above the Park Centre rent that had accumulated in the court registry,[4] and the court directed DNC to make all future payments (though these were not characterized as either “license fees” or “rent under a sublease”) directly to counsel for Park Centre, who was then to remit the base rent for deposit into the registry. After the denial of a motion for rehearing by Midgard and a motion by DNC for relief under Florida Rule of Civil Procedure 1.540, Midgard filed a timely notice of appeal and DNC cross-appealed. The notices of appeal invoked this Court’s jurisdiction under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(ii), because the order determined the right to immediate possession of property.

Analysis

Park Centre’s right to the funds in the registry (and to subsequent monthly payments by DNC) turns on Midgard’s authority to enforce the Park Centre lease. With a threshold acknowledgment that the trial court did its best to interpret a tangled web of agreements and legal authorities — documents written in type so small and language so obtuse as to make appel *306 late judges and their law clerks reach for headache remedies — we conclude that Midgard validly obtained and exercised its authority on behalf of the tenants in common/owners and the mortgage lender for the office park. We concur with the trial court’s conclusion that there were no genuine issues of material fact concerning Mid-gard’s authority, but we reach a different legal conclusion that follows from the pertinent undisputed facts.
Park Centre’s motion and argument focused on certain provisions of the TIC Agreement. Section 2.2.1 of that Agreement specified that the unanimous consent of all tenants in common was required for “the approval of any property management agreement or any extension, renewal or modification thereof.” The same section provided:
Wherever in this Agreement the consent or approval of the Tenants in Common is required or otherwise requested, with respect to any modification or renewal of any property management agreement, the Tenants in Common shall have 30 days after the date the request for consent or approval is received pursuant to Section 10.8 to approve or disapprove the matter.
A “deemed consent” provision further stated:
If a Tenant in Common does not disapprove of such matter within the specified response period described above, the Tenant in Common shall be deemed to have approved the matter.
Park Centre argued successfully below that Midgard failed to establish unanimous consent to its appointment as successor property manager, and that the “deemed consent” provision applied only to “modification or renewal” of an existing property management agreement — not to the execution of a new property management agreement (because that consent lacked a “specified response period”).
However, the affidavits and contractual provisions filed by Midgard in opposition to the motion for summary judgment established without dispute that:
1. Under section 12.1 of the TIC Agreement, the rights and remedies of the tenants in common were expressly subordinate to the rights and remedies of the office park’s mortgage lender following a mortgage default. The tenants in common were the successors in title to the original mortgagors.
2. The mortgage went into default in early 2011. The mortgage and original (pre-Midgard) property management agreement, executed by the original tenants in common and binding on all successors, specified that, after default, the mortgage lender had the right “to replace Property Manager with a management company acceptable to Lender.” Paragraph sixty-four of the mortgage reiterated the subordination of the TIC Agreement to the mortgage, confirming that the mortgage “shall govern, control and super-cede any contrary or inconsistent provisions of [the TIC Agreement].”
3. Although the tenants in common took the initiative to identify Midgard as a successor property manager, they submitted information about Midgard’s experience and a copy of the proposed Midgard property management agreement to the mortgage lender for approval. The mortgage lender consented in writing to Mid-gard’s service as property manager, well in advance of the date Midgard commenced its action against Park Centre and DNC.
Park Centre’s interpretation of these contractual provisions and actions is that the mortgage lender did not directly “replace” Mariner Property Management with Midgard (for example, by signing on *307 as a party to the new property management agreement). Instead, the mortgage lender merely “approved” the new Mid-gard property management agreement signed by almost all of the tenants in common. Park Centre overlooks several controlling points. First, any tenants in common who did not sign the Midgard agreement had subordinated their rights to withhold consent (under the TIC Agreement) to the right of the mortgage lender to designate the successor manager. Second, Park Centre signed a lease whereby it, too, subordinated its rights as tenant to the rights of the mortgage lender (which includes the mortgage lender’s right to designate a successor manager). Third, Park Centre is not a third-party beneficiary entitled to invoke objections to the arrangements made among the tenants in common, their mortgage lender, and Mid-gard.
Midgard has thus demonstrated “a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy,” otherwise known as “standing.” Kumar Corp. v. Nopal Lines, Ltd., 462 So.2d 1178, 1182 (Fla. 3d DCA 1985) (quoting Sierra Club v. Morton, 405 U.S. 727, 731, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Florida Rule of Civil Procedure 1.210(a) underscores that entitlement, authorizing the prosecution of claims in the name of a representative party or agent. In the case at hand, Midgard serves as property manager and rent collection agent for the tenants in common and for the post-default mortgage lender, a “real” party in interest in the truest sense of that term. The mortgage lender, tenants in common as owners, and Midgard have an obvious and unitary interest in collecting defaulted rent.
Addressing the trial court’s release to counsel for Park Centre of the rent payments deposited into the court registry, those payments were mandatory under section 83.232, Florida Statutes (2011), if DNC wished to retain possession pending the final adjudication of the claims and counterclaims. The rent to be deposited under that statute would necessarily include the “Transfer Premium” payable by DNC. The Park Centre-DNC agreement is, as noted above (and in at least three provisions within the agreement itself), a sublease.
Of course, the mere fact that an agreement is entitled a “license” or contains a conclusory provision that the parties have a relationship of licensor and licensee, is not determinative. Rather, the proper characterization of the agreement is discerned by the actual terms, conditions, rights and obligations expressly set forth in the agreement. See e.g., Jabour v. Toppino, 293 So.2d 123 (Fla. 3d DCA 1974); Napoleon v. Glass, 229 So.2d 883 (Fla. 3d DCA 1969).
Ryan v. Nat’l Marine Mfrs. Ass’n, 103 So.3d 1001, 1005 n. 5 (Fla. 3d DCA 2012).

Conclusion

Ultimately, Park Centre’s attacks on Midgard’s “standing” are based on a clever interpretation of a subordinate contract (the TIC Agreement) and unmitigated chutzpah.[5] Park Centre stopped paying rent, while continuing to pocket the differential paid by DNC to Park Centre (but required to be paid to the property manager as a “Transfer Premium” because of the provisions of the Park Centre lease). Without the rental income, the original property manager did not stay current on the office park’s mortgage payments. When the mortgage went into default and a new property manager selected by most (if not all) of the tenants in common/owners, with the consent of the mortgage lend *308 er, brought an eviction action against Park Centre and the court required statutory payments of rent into the registry of the court pending the outcome,[6] Park Centre challenged Midgard’s right to commence the lawsuit.
Under Park Centre’s analysis, the failure or refusal of a single tenant in common, holding as little as a two-percent undivided interest, to grant consent would be sufficient to preclude the appointment of a successor property manager with authority to commence and prosecute the eviction of a lessee defaulting on rent.[7] But we conclude that the mortgage lender controlled the designation of a successor property manager under the applicable documents. When most, if not all, of the tenants in common suggested Midgard as the new manager, the mortgage lender agreed. Midgard then commenced its efforts to manage the property out of its slump. One part of any such effort is the enforcement of the lease documents and the collection of rent. The summary judgment determining that Midgard lacked standing to bring the eviction action, and on that basis releasing deposited funds (and ongoing rent payments) to counsel for Park Centre, is reversed, and the case is remanded for further proceedings consistent with this opinion.[8]
Reversed and remanded.

. In each case, the applicable monthly rent amount was to include an additional amount for sales tax.

. The significance of these features of the Park Centre-DNC agreement is that the correct legal characterization of the agreement as a sublease (rather than a "license” to use the same space for the same term at a higher rent) affects the determination of the amount to be deposited into the registry to retain DNC’s rights of possession of the premises during the pendency of the case.

. DNC continuously made its monthly payments as directed. In the present appeal, it joins Midgard in seeking reversal of the summary judgment and monetary relief obtained by Park Centre. A balance of DNC's deposits into the registry totaling $90,315.72, and the $17,625.00 per month payable by DNC for rent beginning in October 2012, have been paid to counsel for Park Centre pursuant to the order under review. DNC’s initial brief observes that these payments have been made as required despite the fact that "Park Centre does not have an ownership interest in the property, does not appear to have a valid lease, is not the landlord, is not the property manager, and does not provide any service to DNC in exchange for the funds received.”

. These funds, some $90,315.72, represent the higher amount (the "Transfer Premium” as defined in the Park Centre lease) otherwise payable every month by DNC in excess of the rent payable by Park Centre under its prime lease.

. Hayes v. Guardianship of Thompson, 952 So.2d 498, 509 n. 14 (Fla.2006); Zabrani v. Riveron, 495 So.2d 1195, 1197 n. 2 (Fla. 3d DCA 1986).

. § 83.232, Fla. Stat. (2011).

. In response, counsel for Park Centre has suggested that the remedy is for one or more of the tenants in common to partition the property, a solution fraught with obvious drawbacks and delays when the mortgage loan on the property is already in default and a lessee is withholding rent.

. Although we do not reach the merits of the remaining and untried issues among the parties, we note that section 83.232 will require Park Centre's counsel to restore all rent (including “Transfer Premium”) to the court registry if a summary writ of possession against Park Centre is to be avoided. Mid-gard and DNC may also seek disgorgement of those amounts released by the registry to counsel for Park Centre pending trial of the remaining claims and counterclaims.